UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2017 NOV 21  AM 11: 06

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| RICHARD LANGAN, ) | **COMPLAINT** |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| JOHN H. SMITH, AMPM FACILITY ) | |
| SERVICES CORP., MARY JANE ) | Case No: 17-cv-_____ - ____ |
| BEAUREGARD, MATTHEW P. ) | |
| ZAYOTTI, LISA G. ARROWWOOD, ) | |
| ELIZABETH A. KAYATTA, ) | |
| KEEGAN WERLIN LLP, and ) | |
| ARROWOOD LLP ) | |
| ) | |
| Defendants ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff Richard Langan ("Plaintiff") states and alleges as follows:

### INTRODUCTION

1. This action is brought by Plaintiff against AMPM Facility Services Corp. ("AM-PM"),

   John H. Smith ("Smith"), Smith's wife, Mary Jane Beauregard ("Beauregard"), Matthew

   P. Zayotti ("Zayotti"), Lisa G. Arrowood ("Arrowood"), Elizabeth A. Kayatta

   ("Kayatta"), Keegan Werlin LLP ("KW"), and Arrowood LLP, formerly, Arrowood

   Peters LLP  ("AP") (collectively, the "Defendants") for their scheme to profit from

   devising, filing and maliciously prosecuting fraudulent claims and lawsuits to harass and

   extort money from their victims (the "Scheme"), which caused Plaintiff and others to

1

make "settlement" payments and/or incur other related expenses, including legal and investigative expenses.

2. Smith owns and operates AM-PM, a janitorial services company. Smith is a college graduate and a former certified teacher with thirty years of experience negotiating contracts, promissory notes and other legal agreements.

3. In April 1990, Smith hired J. Kenneth Foscaldo ("Foscaldo") as General Manager of AM-PM. In 1998, Foscaldo received five percent of AM-PM's stock as an incentive for his continued effort on behalf of the company.

4. In 2010, AM-PM had 700 employees and gross sales of $17 million. In the fall of 2010, Smith: (a) notified Foscaldo that he was replacing him as General Manager; (b) agreed to purchase Foscaldo's AM-PM stock; (c) moved Foscaldo from a management to a sales role; (d) agreed to sell ten percent of his AM-PM stock to Gregory P. Shay ("Shay"); and, (e) hired Shay as president of AM-PM to prepare AM-PM for sale.

## Smith - Foscaldo Transaction

5. In September 2010, Smith and AM-PM retained attorney Richard D. Paster ("Paster") to represent them in the negotiations with Foscaldo and to prepare the related documents. On November 1, 2010, Smith, AM-PM and Foscaldo signed a Stock Purchase Agreement ("SPA") in which Smith agreed to purchase Foscaldo's stock for $725,000.

6. At the same time, Foscaldo and AM-PM signed an employment agreement ("EA"), which included a "for cause" termination provision and a five-year non-compete covenant (the "Non-Compete").

7. In January 2011, at the closing of the SPA, Smith signed a five-year promissory note ("Note"), payable in annual installments of $112,500.00. The Note included an

acceleration clause which gave Foscaldo the right to demand full and immediate payment of the Note if AM-PM terminated him without cause or Smith failed to make any payment due under the Note. The Non-Compete also ceased if AM-PM terminated Foscaldo, without cause, or Smith failed to make any payment due under the Note. The SPA, EA and the Note are collectively referred to herein as the "Agreements."

Smith - Shay Transaction

8.  On September 30, 2010, Shay retained Plaintiff to prepare the documents relating to his purchase of AM-PM stock from Smith. Smith negotiated the transaction directly with Shay, without consulting or retaining an attorney. On November 5, 2010, Shay and Smith signed the documents and Shay paid Smith $800,000 for ten percent of AM-PM's stock.

9.  At the same time, Shay and AM-PM signed an employment agreement, naming Shay as president with an annual salary of $225,000, and other incentives, including a bonus on the sale of AM-PM.

Addendum to Foscaldo's EA

10. In July 2011, AM-PM and Foscaldo orally agreed to amend his EA. On July 27, Shay retained Plaintiff for AM-PM to document the agreed changes as an addendum ("Addendum") to the EA. The Addendum reduced Foscaldo's hours and compensation and provided that AM-PM or Foscaldo could terminate the EA, without cause, upon thirty days' written notice. The Addendum also provided that if AM-PM or Foscaldo terminated the EA, Foscaldo would retain his company car and health benefits for two additional years.

11. On August 1, 2011, Plaintiff billed AM-PM one hour for preparation of an addendum and related emails and phone calls. On August 2, 2011, Smith signed the Addendum for AM-PM and, on August, 12, 2011, AM-PM paid Plaintiff's invoice.

Shay's Departure

12. On October 4, 2011, Shay retained Plaintiff to prepare the documents in connection with his departure from AM-PM and the sale of his AM-PM stock to Smith. On October 14, 2011, Smith and Shay signed a separation agreement in which Smith agreed to purchase Shay's stock for $800,000, $300,000 on signing with the balance due in 12 monthly installments.

Foscaldo's Departure

13. On November 15, 2011, Smith offered Foscaldo a new position with AM-PM at a salary of $300 per week, plus commissions. Smith also asked Foscaldo if he could pay the first Note payment of $112,500, due on January 6, 2012, in monthly installments of $10,000. Foscaldo rejected the new position with AM-PM and Smith's request to change the payment terms of the Note. On November 18, 2011, Smith went to Foscaldo's home on behalf of AM-PM to hand deliver a termination letter, effective immediately.

14. On November 28, 2012, Foscaldo sued Smith for full payment of the Note and AM-PM for failing to pay him certain benefits under his EA. When Paster explained to Smith that the Addendum did not alter the terms of the Note, Smith replied, "Guess I screwed myself."

Smith's Default on the Note

15. At all relevant times, Zayotti was a partner in KW. In December 2011, he was referred to Smith by Beauregard's daughter, Attorney Megan Jean Beauregard ("Attorney

4

Beauregard"), whom Smith and Beauregard relied on for legal advice. Attorney

Beauregard and Zayotti were in contact with each other during the Foscaldo litigation.

16. Beauregard has been employed by AM-PM since 2010. She assists Smith with the

operation of AM-PM. In January 2012, she loaned Smith $112,500.00. As of February

2015, the loan had not been repaid.

17. The first Note payment of $112,500.00 was due to Foscaldo on January 6, 2012. On

January 4, 2012, Zayotti reviewed the payment and default terms of the Note and the

acceleration clause. He researched whether a payment to an escrow agent would be

sufficient to satisfy the payment terms of the Note. However, the results of his research

were "unclear".

18. Zayotti had a conference call with Smith and Beauregard that day. He informed them of

the results of his research and discussed with them the payment and default terms of the

Note. Zayotti advised Smith to make the Note payment, in escrow, to Paster.

19. On January 6, 2012, Paster advised Smith to make the Note payment; Smith and AM-PM

retained Zayotti to render legal services and to investigate defenses and counterclaims

relating to the Foscaldo litigation; Beauregard deposited $112,500 with Paster or to his

escrow account; and, Zayotti informed Foscaldo's attorney that Smith would dispute

Foscaldo's demands and tender $112,500 to Paster to be held in escrow pending the

resolution of Foscaldo's suit.

20. On January 9, 2012, Foscaldo's attorney informed Zayotti that the payment in escrow did

not satisfy the payment terms of the Note and that Smith's undisclosed defenses were not

grounds for non-payment. Foscaldo's attorney further informed Zayotti that, under the

express terms of the Note, all amounts due were payable "without setoff, counterclaim or any deduction whatsoever".

21. On January 23, 2012, Paster filed a notice of withdrawal as counsel to Smith and AM-PM in *Foscaldo*. He was replaced by Zayotti as counsel to Smith and AM-PM.

## Attempt to Defraud Paster

22. In February 2012, Paster agreed to provide an affidavit in support of Smith's opposition to Foscaldo's motion for summary judgment. According to Zayotti, Paster's affidavit was intended to provide support for the position that the Agreements were inter-related and intended by the parties to be read together. Zayotti, however, knew the Agreements were not inter-related. In January 2012, he reviewed the Note and the letter from Foscaldo's attorney in which he quoted the operative terms of the Note. Zayotti was also present at a preliminary hearing on Foscaldo's motion. Zayotti later described how the judge was viewing the Agreement at that hearing:

> One of the judge's issues was that – it was clear from her comments that she was viewing all of the Agreements, all of the contracts independently from each other. She wasn't viewing them as or reading them as a collection of contracts that made up the entire agreement. She was viewing – there were different parties to different contracts, and different signatories on the Note, and she was viewing them, viewing the Note in particular, in isolation of the other documents.

23. On May 24, 2012, Zayotti phoned Paster to discuss his affidavit. Zayotti did not inform Paster before the call that: (a) Smith had engaged him to investigate counterclaims in the Foscaldo litigation; (b) he was, at the time of the call, investigating malpractice claims against Paster; or, (c) he would ask Paster on the call about the advice he gave Smith on the acceleration clause.

24. On the call, Zayotti attempted to entrap and coerce Paster into making statements against his interest regarding the advice he gave Smith on the acceleration clause. Zayotti asked Paster if he told Smith that the Note payments would accelerate if Foscaldo were terminated without cause. According to Zayotti, Paster told him that he did not recall having advised Smith of that fact.

25. Based on their phone call, Zayotti prepared Paster's affidavit ("Draft Affidavit"). The Draft Affidavit states: "I explained the accelerated payment terms the sale of AM-PM would trigger in detail to Smith. Other than that I do not recall ever having had a discussion with Smith in which I specifically explained to him the circumstances under which the acceleration clause would be triggered."

26. On May 25, 2012, Zayotti emailed the Draft Affidavit to Paster and Beauregard. He also initiated a conference call from his office, with Smith in Paster's office and Beauregard at a third location. Zayotti could not "specifically recall" why he wanted Smith and Beauregard on the call. Zayotti did not inform Paster before the call that he would be asking him about the acceleration clause.

27. On the conference call, Zayotti asked Paster for the second time whether he explained to Smith that the Note payments would accelerate if Foscaldo were terminated without cause. According to Zayotti, he repeated that question because he was hoping to get Paster to be able to say it in the affidavit, even though he had already included Paster's answer to that question in the Draft Affidavit.

28. According to Zayotti, on the conference call, Paster said that he did recall explaining the acceleration clause to Smith. However, Zayotti could not recall whether Smith said anything to deny or challenge Paster's statement. Nor could Zayotti recall whether

7

Beauregard said anything in response to Paster's statement. Zayotti recalled that "everybody participated in the conversation" but he could not recall what Smith or Beauregard may have said.

29. On May 26, 2012, Zayotti emailed Paster a revised affidavit ("Revised Affidavit"). He copied Smith and Beauregard on that email. The Revised Affidavit states: "I do not believe Smith had a full understanding of the acceleration clause." That statement flatly contradicts the Draft Affidavit; Zayotti's January 24, 2012, phone call with Paster ("Can't say Smith didn't know what agreement said"); Zayotti's notes from that call with Paster; and, Paster's statement from the day before ("I do recall explaining [the acceleration clause] to Smith").

30. On May 29, 2012, Paster signed his version of the affidavit, which did not include the statement, "I do not believe Smith had a full understanding of the acceleration clause," and emailed it to Zayotti.

31. Zayotti filed Paster's affidavit with the court that day and had limited contact with Paster thereafter.

Shay's Affidavit

32. In March 2012, Zayotti asked Shay to provide an affidavit in connection with the Foscaldo litigation. He never met with Shay but had three or four phone calls with him to obtain the information from which he prepared the affidavit.

33. On March 7, 2012, under the pains and penalties of perjury, Shay signed the affidavit that Zayotti prepared for him. In it, he states that: (a) "AM-PM retained [Plaintiff]"; (b) the purpose of the Addendum was to permit Foscaldo to retire "imminently" and "still keep his company car and receive health benefits for two more years"; (c) "neither I nor

[Plaintiff] had been made aware, and were therefore denied the benefit of, other existing inter-related agreements between AM-PM, Smith and Foscaldo, including the Note"; and, (d) "it was clearly never the intention of AM-PM to amend Foscaldo's [EA] to give AM-PM the right to terminate Foscaldo, without cause, and thereby trigger [if Foscaldo were terminated without cause] an immediate obligation on the part of Smith to pay Foscaldo $700,000.00".

34. In July 2012, Zayotti filed Shay's affidavit with the court in opposition to Foscaldo's motion for summary judgment.

## The Superior Court Decision

35. On November 13, 2012, Foscaldo was granted summary judgment on the Note and on some, but not all, of Smith's and AM-PM's counterclaims, alleging, *inter alia,* that Foscaldo breached his fiduciary duties; misappropriated corporate assets and opportunities; defrauded AM-PM through false expense reimbursement requests; and, assaulted Smith (hereinafter, "*Foscaldo*").

36. With regard to the Note, the Superior Court held: "The terms of the Note make it clear that payment was to be made to Foscaldo. The Note expressly provides that amounts due thereunder are not subject to setoff, counterclaim, or any other deduction whatsoever. Smith's position that he satisfied his obligations under the Note by making an escrow payment to his attorney, to be held in an IOLTA account, is without merit."

37. The Superior Court also found that:
- Smith was a party to the Note, but not the Addendum;
- AM-PM was a party to the Addendum, but not the Note;
- Nothing in the record (which includes Shay's affidavit) suggests that AM-PM and Foscaldo intended that the Addendum modify the Note; and,

- Smith ignored the fact that the Note relates to his purchase of Foscaldo's stock and not to the governance of AM-PM, and he ignored the expressed terms of the Note.

38. On January 18, 2013, the Superior Court ruled on Smith's emergency motion for reconsideration. The court found that:

> The rule that interlocking documents shall be read together does not apply where, as here, the parties to the Note [Smith and Foscaldo] manifested intent is that they shall not be read together. The Note sets forth the entire agreement and provides that Smith's obligations are absolute and unconditional.

Smith v. Paster *("Smith")*

39. In May 2013, Zayotti prepared and filed with the Superior Court the complaint ("Complaint") in *Smith* against Paster and his firm, Paster, Rice & Castleman, LLC ("PRC"). Zayotti did not name Plaintiff as a defendant in *Smith*.

40. The Complaint alleges, *inter alia,* that Paster provided deficient legal advice to Smith and AM-PM in connection with the negotiation and execution of the Agreements.

The Amended Complaint

41. Between May 10, 2013 and September 4, 2013, Smith, AM-PM and Beauregard retained Arrowood to represent them in *Smith*. Zayotti assisted Smith with retaining Arrowood. He conferred with her, Smith and Beauregard on several occasions before Arrowood was retained. The *Smith* docket sheet does not reflect a withdrawal of appearance filed by Zayotti. According to his testimony, after he ceased representing Smith and AM-PM, Zayotti represented Beauregard.

42. On August 29, 2013, Kate Harlow ("Harlow"), an employee of AM-PM, phoned Plaintiff and requested copies of his AM-PM files ("Case File").

43. On September 1, 2013, Plaintiff emailed the Case File to Harlow. The Case File consists of documents relating to the Addendum engagement, including emails, the draft Addendum, the EA, the reviewed Addendum and Plaintiff's invoice to AM-PM.

44. On September 3, 2013, Paster and PRC filed their Answers in *Smith.*

45. On September 4, 2013, Kayatta attempted to file an Amended Complaint in *Smith,* which was returned by the court for failure to include a Motion to Amend.

46. In October 2013, according to his testimony, Zayotti withdrew from *Foscaldo* and transferred his case files to AP. The *Foscaldo* docket sheet does not reflect a notice of withdrawal filed by Zayotti.

47. On October 17, 2013, Kayatta filed a Motion to Amend the Complaint in *Smith.* On October 31, 2013, the motion was allowed.

48. On November 18, 2013, Kayatta filed the Amended Complaint, which added Beauregard as a plaintiff and Plaintiff as a defendant in *Smith.*

49. On December 3, 2013, Plaintiff was served with the Amended Complaint. The Amended Complaint names Plaintiff in Count VI (AM-PM: Legal Malpractice); Count VII (Smith: Negligent Infliction of Emotional Distress); and, Count VIII (Beauregard: Loss of Consortium).

50. The Amended Complaint alleges that, in July 2011, seven months after the Agreements were signed and while AM-PM was making the agreed payments to Foscaldo, AM-PM grew dissatisfied with his performance.

51. Count VI of the Amended Complaint alleges that, in July 2011, AM-PM retained Plaintiff "in connection with the negotiation and preparation of a new agreement that would ensure Foscaldo's smooth termination from AM-PM"; that, "on information and

11

belief, Plaintiff never consulted the SPA or the Note while preparing the Addendum";

that Plaintiff "neglected to advise AM-PM that 'for cause' provisions still affected

Foscaldo's employment"; that Plaintiff "failed to incorporate provisions of the Note or

the SPA when drafting the Addendum"; and, that, "as a result of his failure to include

provisions of the Note or SPA in the Addendum, AM-PM suffered damages".

"Settlement" in *Foscaldo*

52. In January 2014, Smith, AM-PM and Foscaldo entered into a "settlement" agreement,

effectively agreeing to re-instate annual payments on the Note and releasing each other

from all claims, including the remaining counterclaims. In March 2014, Foscaldo's

summary judgment was incorporated into an Agreement for Judgment between Smith,

AM-PM and Foscaldo.

"Settlement" and Dismissal of *Smith*

53. On April 15, 2015, the Superior Court granted, without opposition, Plaintiff's motion for

summary judgment.

54. On May 4, 2015, the *Smith* plaintiffs, Paster and PRC reported to the Superior Court that

they had "settled".

55. On September 15, 2015, the Superior Court dismissed all counts against Plaintiff.

## JURISDICTION AND VENUE

56. This Court has original jurisdiction under 28 U.S.C. Sections 1331, 1338(a) and (b), and

1367(a) because this action arises under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C., Sections 1961 *et seq.*

57. This Court has supplemental jurisdiction under 28 U.S.C. Section 1367, because all other

claims are so related to those claims over which the Court has original jurisdiction as to

form part of the same case or controversy under Article III of the United States
Constitution.

58. This Court also has diversity jurisdiction under 28 U.S.C. Section 1332, with respect to
Smith and Beauregard who are citizens of New Hampshire. The amount in controversy
Plaintiff claims Defendants Smith and Beauregard owe him is more than $75,000.00.

59. Personal jurisdiction comports with due process under the United States Constitution and
the long-arm statute of Massachusetts, Mass. Gen. Laws ch.223A, Section 3, and the
Defendants, either directly or through other Defendants as agents, systematically and
continually conduct business in Massachusetts, including filing fraudulent claims and
lawsuits and directing other communications to Massachusetts residents, including
Plaintiff.

60. Venue is proper in this District under 28 U.S.C. Section 1391(b) (2) because a substantial
part of the events that give rise to the claim occurred in this District.

## PARTIES

61. Plaintiff is a citizen of Middlesex County, Massachusetts, a member of the Massachusetts
bar and engaged in trade or commerce in Massachusetts as a sole practitioner.

62. Defendant AM-PM is a Massachusetts corporation with its main office at 295 Weston
Street, Waltham, Middlesex County, Massachusetts, and offices at 1087 Elm Street,
Suites 401 through 404, Manchester, New Hampshire 03103.

63. Defendant Smith is a citizen of New Hampshire, residing at 23 Arrowhead Drive,
Bedford, New Hampshire. Smith is the President, Treasurer, Secretary, Director,
Registered Agent and sole shareholder of AM-PM.

64. Defendant Beauregard, Smith's wife, is a citizen of New Hampshire, residing at 23 Arrowhead Drive, Bedford, New Hampshire.

65. Defendant KW is a Massachusetts professional limited liability company with its main office at 265 Franklin Street, Boston, Suffolk County, Massachusetts, 02110. KW was organized to engage in and render professional services in the practice of law.

66. At all relevant times, Defendant Zayotti, an attorney, was a partner in KW. In December 2016, Zayotti left KW and is presently assistant general counsel for a healthcare company in Waltham, Massachusetts.

67. Defendant AP is a Massachusetts professional limited liability company with its main office at 10 Post Office Square, 7th Floor South, Boston, Suffolk County, Massachusetts, 02109. AP was organized to engage in and render professional services in the practice of law.

68. Defendant Arrowood is a citizen of Massachusetts, an attorney and a partner in AP.

69. Defendant Kayatta is a citizen of Massachusetts, an attorney and an employee of AP.

## CLAIMS

### First Count For Relief
### Malicious Prosecution

70. Plaintiff incorporates by reference all allegations contained in this Complaint.

71. The Defendants deprived Plaintiff of his ability to exercise his property rights and his right to be free from unjustifiable litigation.

**AM-PM**

72. On November 18, 2013, the Amended Complaint, adding Beauregard as a plaintiff and Plaintiff as a defendant, was filed with the Court.

73. The "damages" claimed in the Amended Complaint were the legal fees incurred by AM-PM and Smith in *Foscaldo* and the loss to AM-PM of the Non-Compete.

No Probable Cause

74. Count VI of the Amended Complaint alleges that AM-PM retained Plaintiff in connection with the negotiation and preparation of a new agreement that would ensure Foscaldo's smooth termination from AM-PM.

75. AM-PM knew there was no probable cause for that allegation. Shay was the only representative of AM-PM to work with Plaintiff on the Addendum. Shay testified that he did not tell Plaintiff that the purpose of the Addendum was to ensure Foscaldo's smooth termination from AM-PM. Shay testified that AM-PM retained Plaintiff to specifically document the addendum based on the terms sheet he was given.

76. Count VI of the Amended Complaint further alleges that AM-PM suffered damages because Plaintiff failed to consult or incorporate provisions of the Note or the SPA when drafting the Addendum.

77. AM-PM knew there was no probable cause for that allegation. AM-PM did not engage Plaintiff to review the Agreements or any other documents. Shay testified that the Note was not part of the scope of the work on the Addendum and that he never had a discussion with Plaintiff about the fact that the EA referred to the SPA or the Note.

78. AM-PM knew it suffered no damages when it terminated Foscaldo. The Addendum gave AM-PM the right to terminate Foscaldo at any time, with or without cause, upon thirty days' written notice. Under the Note, Foscaldo's termination, without cause, gave him the right to demand full and immediate payment from Smith. AM-PM was not a party to the

Note and, thus, it was not harmed when Foscaldo exercised his right to accelerate the
Note.

79. Smith's failure to pay the Note in full on demand terminated the Non-Compete. Smith
testified that he knew that his failure to make any payment on the Note would terminate
the Non-Compete. Thus, any harm to AM-PM resulting from the loss of the Non-
Compete was caused by Smith.

80. In light of these facts, at the time Plaintiff was served with the Amended Complaint, AM-
PM could not have reasonably believed it had a valid claim against him.

81. AM-PM knowingly initiated and continued the *Smith* litigation against Plaintiff without
probable cause and for an improper purpose.

Malice (Improper Purpose)

82. AM-PM acted with malice when it brought its claim against Plaintiff. It had an improper
purpose in bringing and continuing the claim. AM-PM instituted the action against
Plaintiff even though it knew the claim was without merit. It did so willfully,
intentionally and maliciously to harass the Plaintiff and extort money from him.

83. AM-PM deliberately ignored Plaintiff's Case File and the *Foscaldo* decision. As a
defendant in that case, AM-PM was well aware that, on November 13, 2012, the Superior
Court found that: (a) The Addendum gave AM-PM the option of terminating Foscaldo,
with or without cause and (b) the record clearly establishes that AM-PM ratified the EA
and the Addendum.

84. AM-PM had Plaintiff's Case File for three days before it attempted to file the Amended
Complaint. A minimal amount of inquiry by AM-PM would have revealed that there was
no probable cause for its claim against Plaintiff.

16

85. AM-PM caused damages to Plaintiff by imposing legal and other costs on him that would have been avoided if, prior to filing the Amended Complaint, it had conducted a minimal amount of inquiry, or had not willfully concealed or deliberately ignored the facts which would have been known to it had it not consciously disregarded them.

## Refused to Produce Documents

86. AM-PM acted with malice when it refused to provide Plaintiff with copies of the executed SPA, Note and Addendum.

87. In November 2014, Plaintiff requested copies of the executed SPA, Note and Addendum. AM-PM refused to provide them (a total of ten typed pages) on the ground that they had been produced in response to Paster's document request.

88. In response to Paster's request, AM-PM produced a thumb drive containing *thousands of un-indexed* documents. The three documents requested by Plaintiff were central to AM-PM's claim against him.

89. The Superior Court rules permit that court to impose attorney's fees for discovery abuses, such as stonewalling and obstructionist tactics. The willful failure to disclose a known document after it is requested is an especially pernicious discovery abuse.

90. By refusing to provide copies of the requested documents, AM-PM willfully and maliciously obstructed Plaintiff's discovery and caused him damages by forcing him to search through the thumb drive to locate the requested documents.

## Smith

91. Smith sued Plaintiff for Negligent Infliction of Emotional Distress.

92. As the sole owner and president of AM-PM, Smith authorized the filing of Count VI of the Amended Complaint on behalf of AM-PM and personally authorized the filing of

Count VII of the Amended Complaint. Smith is also responsible for his and AM-PM's answers ("Answers") to Plaintiff's interrogatories.

93. Under penalties of perjury, Smith represented in his Answers that "AM-PM and I, through Shay, engaged [Plaintiff] to modify Foscaldo's [EA] *to ensure Foscaldo's smooth termination from* AM-PM. The goal of changing Foscaldo's [EA] was to make it easier for AM-PM to terminate Foscaldo, *without any undue consequences for John Smith* or *AM-PM.* Shay had a conversation with [Plaintiff] about the new terms of Foscaldo's [EA] and [Plaintiff] drafted an Addendum modifying [it]. On behalf of AM-PM, I executed the Addendum. In doing so, I relied on the legal counsel and advice that [Plaintiff] provided *to AM-PM and me through Shay* (Emphasis Added).

94. Smith further represented in his Answers that "AM-PM and I, through Shay, engaged [Plaintiff];" "[Plaintiff] represented AM-PM and me;" and "[Plaintiff] advised AM-PM and me".

No Probable Cause

95. Smith knew there was no probable cause for his or AM-PM's claim. He testified that he never met or spoke with Plaintiff and did not authorize Shay to retain Plaintiff to represent him.

96. Smith testified that he never discussed with Shay the conversations he had with Plaintiff about the Addendum; that he never told Shay about the SPA or the Note; and that he did not instruct Shay to have Plaintiff review them. According to Smith, "I was in New Hampshire at the time so I wasn't really involved in [the Addendum] that much."

97. In light of these facts, at the time Plaintiff was served with the Amended Complaint, Smith could not have reasonably believed he or AM-PM had a valid claim against him.

98. Smith knowingly initiated and continued the *Smith* litigation against Plaintiff without probable cause and for an improper purpose.

Malice (Improper Purpose)

99. Smith brought his and AM-PM's claims against Plaintiff with malice. He knew there were no facts to support them. Smith had an improper purpose in bringing and continuing the claims. He instituted the action against Plaintiff even though he knew the claims were without merit. He did so willfully, knowingly and maliciously to harass Plaintiff and extort money from him.

100.    Even though he had a fiduciary duty to inform Shay (the minority owner of AM-PM) of the Note, Smith did not tell Shay about it or give him a copy of the Note or the SPA.

101.    Smith testified that he did not read the Addendum before signing it for AM-PM. Whatever duty an attorney owes to properly draft and explain a legal document does not relieve the client of its own duty to ascertain for itself the contents of the document it is signing.

102.    Smith deliberately ignored the *Foscaldo* decision. As a defendant in that case, Smith argued that the Addendum modified the Note. However, the court found that there was no legal basis for his position. "First, Smith signed the Note in his individual capacity. He is not a party to either the [EA] or the Addendum. [Second,] nothing in the record suggests the parties [to the Addendum] intended this result."

103.    Smith was admonished by the court: "Smith ignores the fact that the Note relates to his purchase of Foscaldo's stock and not to the governance of [AM-PM], and he ignores the express terms of the Note."

104.     In discovery, Smith was asked to name the parties to the Addendum and the capacity in which each signed. He declined to answer that question because "the capacity in which each signed" is "vague". However, Smith understood that phrase well enough to sign his Answers in his individual capacity and AM-PM's Answers in a representative capacity.

105.     Smith caused damages to Plaintiff by imposing legal and other costs on him that would have been avoided had he not brought fraudulent claims against him and served him with materially false Answers. Smith did so willfully, intentionally and maliciously to harass the Plaintiff and extort money from him.

**Beauregard**

106.     Beauregard sued the Plaintiff for Loss of Consortium.

107.     As an employee of AM-PM, Beauregard had a tremendous amount of work to do regarding Foscaldo's lawsuit. During *Foscaldo*, she learned that Plaintiff was engaged by AM-PM to prepare the Addendum.

108.     In September 2013, Beauregard exchanged emails or had a follow up conversation with Shay about the "clear intention" of the Addendum.

No Probable Cause

109.     Beauregard knew there was no probable cause for her claim. Beauregard materially contributed to the malicious prosecution of Plaintiff by providing false testimony that Plaintiff represented Smith:

Q – Do you know if your husband was represented by an attorney with respect to the Addendum?
A – I know now that he was represented by [Plaintiff].
Q – How did you come by that knowledge?
A – Because [Plaintiff] represented AM-PM, and my husband signed it. [Plaintiff] was the one that constructed this document from what I was – from what I understand.

20

Q – Is it your understanding that [Plaintiff] represented your husband, personally?
A – It is my understanding that my husband was being represented personally and AM-PM.

110.    Beauregard materially contributed to the malicious prosecution of Plaintiff by

providing materially false evidence to AM-PM to include in its Answers:

> In September 2013, employee Beauregard "*exchanged emails* with Shay to request copies of any emails he had with [Plaintiff] concerning the legal work he performed with AM-PM. Shay replied that he could not find anything, other than what [Plaintiff] had already provided to AM-PM, but that *the clear intention of changing* Foscaldo's [EA] *was to make it so both parties could terminate* [it] *and there would be no acceleration*" [of the Note]" (Emphasis Added).

111.    Beauregard and AM-PM knew there was no probable cause for that Answer. AM-

PM could have no intention, "clear" or otherwise, of "changing" the Note because Shay

had no knowledge of the Note.

112.    In light of these facts, at the time the Plaintiff was served with the Amended

Complaint, Beauregard could not have reasonably believed she, AM-PM or Smith had a

valid claim against him.

113.    Beauregard knowingly initiated, continued and took an active part in the *Smith*

litigation against the Plaintiff without probable cause and for an improper purpose.

**Malice (Improper Purpose)**

114.    Beauregard brought her claim against Plaintiff, provided false evidence to AM-

PM and gave false testimony at her deposition with malice. She had an improper purpose

in bringing and continuing her claim and advancing the other claims against Plaintiff. She

sued Plaintiff even though she knew Counts VI, VII and VIII of the Amended Complaint

were without merit. She did so willfully, knowingly and maliciously to harass Plaintiff

and extort money from him.

115.     Beauregard acted with malice when she gave false testimony that, in September 2013, in an email or follow-up conversation, Shay told her that the clear intention of the Addendum was to make it so AM-PM or Foscaldo could terminate his EA and there would be no acceleration of the Note.

116.     At his deposition, Shay was asked:

Q - When you engaged [Plaintiff] or at any time during the engagement, did you tell him that the clear intention of changing [Foscaldo's EA] was to make it so both parties could terminate the agreement and there would be no acceleration?
A – I don't know what was in that email [referring to AM-PM's Answer], but the answer to that is no.

117.     At her deposition, Beauregard testified:

Q – Would you describe [AM-PM's Answer] as a fair representation of [Shay's] response to your email?
A - "Yes. That's what he said."
Q – Is [AM-PM's Answer] a direct quote from [Shay's] email?
KAYATTA: If you know.
A- "I don't remember if that's a direct quote or not."
Q – Was this email exchange produced in your document production?
A – I don't know. I don't know whether this was a follow up conversation or if this was an email. I do remember [Shay] saying that the clear intention of the [Addendum] was to make it so that both parties could terminate the agreement without any acceleration or other negative consequence."

118.     No such email was produced by Beauregard or AM-PM.

119.     Beauregard acted with malice when she gave false testimony that Smith did *not* participate in the May 25, 2012, conference call in which Smith, Beauregard and Zayotti sought to entrap and coerce Paster into making statements against his interest (See ¶¶ 22-31).

120.     Beauregard caused damages to Plaintiff by imposing legal and other costs on him that would have been avoided had she not: (a) brought her fraudulent claim against him; (b) provided AM-PM with false evidence; and, (c) given false testimony to advance the

malicious prosecution against him. She did so willfully, intentionally and maliciously to harass Plaintiff and extort money from him.

**Zayotti**

121.     During the Foscaldo litigation, Zayotti worked closely with Beauregard in her capacity as an employee of AM-PM. Beauregard learned from Zayotti that AM-PM retained Plaintiff to prepare the Addendum.

122.     On May 10, 2013, Zayotti prepared and filed the Complaint in *Smith* against Paster and PRC.

123.     Between May 10, 2013 and September 4, 2013, Zayotti assisted Smith with retaining Arrowood to assume the *Smith* litigation. Zayotti conferred with Arrowood, Smith and Beauregard on several occasions before Arrowood was retained.

124.     While Zayotti testified that he ceased representing Smith and AM-PM after Arrowood assumed the *Smith* litigation, the *Smith* docket sheet does not contain a notice of withdrawal filed by Zayotti.

125.     Zayotti testified that, after he ceased representing Smith and AM-PM, he represented Beauregard. During the *Smith* litigation, Zayotti provided Beauregard with legal advice and had email and verbal contact with her. Zayotti also continued to have contact with attorneys in Arrowood's office and had phone calls with Arrowood.

126.     In October 2013, Arrowood assumed the *Fosclado* litigation. Zayotti testified that he withdrew from *Foscaldo* and transferred his case files to AP. However, the *Fosclado* docket sheet does not contain a notice of withdrawal filed by Zayotti.

127.     After Arrowood assumed the *Smith* litigation, Smith, AM-PM, Beauregard and

their AP attorneys continued to rely on Zayotti and sought his advice and counsel because

of his long historic participation on the *Foscaldo* case.

**No Probable Cause**

128.     Zayotti knew, as a matter of law, that there was no probable cause for the claims

against Plaintiff.

129.     Zayotti prepared Shay's affidavit. He knew that Shay was the only representative

of AM-PM to work with Plaintiff on the Addendum, and that Smith did not tell Shay

about the Note. Zayotti scheduled, but did not take, Shay's deposition in *Foscaldo*.

130.     In January 2012, Zayotti spoke with Plaintiff by phone for less than a half hour. "I

asked him about the background of the Addendum. I don't recall anything else

specifically." Zayotti did not follow-up with him, depose or name Plaintiff as a defendant

in *Smith*.

131.     Zayotti attended the hearing on Foscaldo's motion for summary judgment and

was aware that the court was viewing the Agreements independently from each other

(See, ¶22).

132.     As counsel to Smith and AM-PM, Zayotti was aware of the court decision and

order in *Foscaldo* (See, ¶22). He understood that Smith and AM-PM were bound by the

court's findings (See, ¶158).

133.     In light of these facts, at the time Plaintiff was served with the Amended

Complaint, and while he was representing Beauregard and providing advice and counsel

to the *Smith* plaintiffs' and their attorneys, Zayotti could not have reasonably believed

that AM-PM, Smith or Beauregard had a claim against Plaintiff as a result of his work on the Addendum.

134.      Although Zayotti testified that, at some point, he ceased representing Smith and AM-PM, neither the docket sheet in *Foscaldo* nor *Smith* reflect the filing by Zayotti of a notice of withdrawal. While Zayotti initiated the *Smith* case without naming Plaintiff as a defendant, he continued to play an active role in the *Smith* litigation after Plaintiff was named a defendant. At all relevant times, Zayotti knowingly took an active part in continuing the *Smith* litigation against the Plaintiff without probable cause and for an improper purpose.

**Malice (Improper Purpose)**

Concealed or Ignored His Clients' Fraud

135.      Zayotti acted with malice when he willfully concealed or deliberately ignored his knowledge of his client's and "former" clients' fraud on Plaintiff, a fact that was or would have been known to him had he not consciously disregarded it. By failing to disclose the fraud, Zayotti materially contributed to the malicious prosecution of Plaintiff. His improper purpose for not disclosing the malicious prosecution was to conceal his central role in the fraud.

136.      Zayotti caused damages to the Plaintiff by imposing legal and other costs on him that would have been avoided had he disclosed the fraud to him.

137.      As an officer of the court, pursuant to the Massachusetts Rules of Professional Conduct ("RPC"), Zayotti had a duty to disclose the fraud to the Superior Court and Plaintiff.

Obstructed Discovery in *Smith*

138.　　　In March 2015, Zayotti was deposed in *Smith*. At his deposition, Zayotti was

unwilling to give a straight answer to even a simple question:

Q – And just so I'm clear, you didn't know Arrowood personally, and had no connection with her in any way, other than learning that she was going to assume taking the file over and the representation in the Foscaldo litigation?
A – It's correct to say I did not know her personally prior to the Foscaldo litigation, but otherwise, I'm not sure I can agree to your characterization.
Q – I'm trying to speak English. I'm just trying to understand what your relationship, how you would describe your relationship with Arrowood, are you members of the same organizations?
A – No.
Q – Okay. Other than the contact you've described to me today, have you had any dealings or contact with her since the *Foscaldo* litigation?
A – I don't believe so, no.
Q – All right, so I'm confused on why you couldn't agree to what I asked. I just want to make sure I'm not missing anything.
A – I don't believe you are missing anything, but I'd have to hear the question again in order to explain that. I'm not trying to be difficult, I just, the way you characterized it didn't strike me as entirely correct.
Q – But you can't tell me how that was wrong?
A – If we can read the question back, I can try.
(Question Read)
A – So, that's inaccurate because I knew her before I learned that she was taking over the case, and had conferred with her and the clients on several occasions before that time.
Q – Okay, but that was her becoming involved in some capacity in the Foscaldo litigation?
A – In part, yes.
Q – You didn't bring her in yourself to be involved?
A – I assisted the client in bringing her in to be involved on the claims against Paster.

139.　　　When asked if he had any contact with Beauregard after he ceased representing

Smith and AM-PM, Zayotti replied:

A – Are you asking for telephone, email communications, or are you asking for verbal communications?
Q – I'm asking for all contact. After you stopped representing her and AM-PM –
A – Yes.
Q – I'm just looking to see if you had dealings with her in some fashion or form?

After Arrowood objected, Zayotti answered a re-phrased question:

A - The difficulty I have with your question is that it's premised on, after I ceased representing. Now I maybe didn't have an appearance in *Foscaldo* anymore, but I believe that the subsequent communications I had with Beauregard would have been in connection with requests for legal advice. So that said, I have, you know, periodically had email communications, as well as I believe some verbal communications as well.

140.    Zayotti was asked if he had any contact with Smith after he ceased representing him and AM-PM:

Q – After you ceased representation of AM-PM and Smith, and anything associated with transferring information or transitioning to new counsel, have you had any other contact with Smith up until the present day?
A – I can't recall.

141.    At his deposition, Zayotti was shown a September 2010 email from Smith to

Foscaldo, which states: "If terminated by [AM-PM, Foscaldo] will be given his car,

medical insurance will be paid for two years by AM-PM, and remainder of 800k."

Zayotti "could not recall" if he discussed that email with Smith.

142.    In January 2012, Zayotti asked Paster if "Smith understood the Agreements."

According to Zayotti's notes from the call, Paster told him, "Can't say Smith didn't know

what agreement said."

143.    The day he was subpoenaed, Arrowood spoke with Zayotti by phone. At his

deposition, Zayotti was asked about that conversation:

Q - In that conversation, you didn't have any discussions about the issues, or Paster or anything like that, or did you?
A – I don't believe I did. It was a very brief conversation. We may have briefly touched upon whether I recalled the conversation I had with Paster about the acceleration clause, we may or may not have talked about that."
Q – And that would have been brought up by Arrowood to your memory?
A - I believe so, if it was.

144.    During a break in his deposition, Arrowood and Kayatta met privately with

Zayotti. Immediately after the break, Zayotti had "trouble recalling" what they had just

discussed:

Q – Did she tell you what she was going to ask you regarding [the deposit of the first
Note payment in escrow]?
A – No.
ARROWOOD: "In a few minutes, you'll know exactly what I'm going to ask him."
Q – Do you recall anything else in your conversation during the break with Arrowood?
A – I'm trying to remember if there was one other area she said she was going to ask me
about. Sorry, I believe there was one other area she said she was going to ask about.
Q – Okay, mark that as the next exhibit.
A – Oh, the other thing she was going to ask me about.
Q - You remembered the other topic during the break that she said she wanted to ask you
about?
A – Yeah, about the idea that you were asking me about, about the separation or the
distinction between the defense versus the counterclaims.
Q – Okay, so she gave you a heads up of what's coming.
A – Well, she didn't tell me the specific questions - -
ARROWOOD: The coming attractions.
A - - but she told me the topics she was going to ask me about.

145.    Zayotti acted with malice when he intentionally obstructed discovery in *Smith* by
obfuscating his testimony through a practiced mix of evasion, feigned memory loss and
purposeful misdirection. By refusing to testify forthrightly, Zayotti materially contributed
to his clients' malicious prosecution of Plaintiff and he concealed his own role in the
fraud.

146.    Zayotti caused damages to Plaintiff by imposing legal and other costs on him that
would have been avoided had he given direct and frank testimony at his deposition.

<u>There Were No Damages in *Smith*</u>

147.    The "damages" claimed in *Smith* were the legal fees incurred by Smith and AM-
PM in *Foscaldo* and AM-PM's loss of the Non-Compete.

148.    KW billed AM-PM $463,053.00 to defend Smith on the Note and to investigate
and assert counterclaims in *Foscaldo*.

149.     AP billed Smith at least $161,149.99 for services "in reference to J. Kenneth Foscaldo." Before producing its billing records, however, AP redacted the entire description of services in each of its invoices. At a minimum, for the *Smith* plaintiffs' to prove AP's fees were recoverable damages, AP would have had to disclose its billing records.

150.     Smith understood that his failure to pay the Note in full on demand would terminate the Non-Compete. Thus, any harm resulting to AM-PM from the loss of the Non-Compete was caused by Smith.

151.     The legal fees paid KW to assert a frivolous defense for non-payment of the Note were not recoverable damages. In *Foscaldo*, the court found that Smith's position that he satisfied his obligations under the Note by making an escrow payment to Paster's escrow account was "without merit."

152.     The legal fees paid to investigate and assert the eleven counterclaims against Foscaldo were not recoverable damages. Foscaldo was granted summary judgment on most of those claims. The remaining counterclaims, for such things as diversion of AM-PM's corporate assets and opportunities, were not recoverable damages against Plaintiff because those claims had nothing to do with the preparation of the Addendum. In *Foscaldo*, the court found that, even "assuming AM-PM had valid counterclaims against Foscaldo, those claims did not affect Smith's obligation to make payment when due in accordance with the terms of the Note."

153.     KW billed about half of its fees, or $231,000, after Foscaldo was granted summary judgment on the Note. Thereafter, the services Zayotti performed in *Foscaldo*

for Smith and AM-PM related mainly to investigating and developing counterclaims and

preparing the Complaint in *Smith*.

154.     At his deposition, Zayotti testified about the counterclaims in *Foscaldo*:

Q – And the counterclaim begins on page 11 and goes through page 32?
ARROWOOD: Oh, please don't ask him to read that.
Q - No, I'm not going to. I'm trying to simplify.
Q - And the counterclaim that's set forth there essentially sets out the position of Smith as
far as the wrongful conduct he believed Foscaldo was engaged in while an employee of
AM-PM. I know that's a rudimentary summary, but is it the gist of the counterclaim?
A – Yeah, that's the thrust of the counterclaim, correct.
Q – Can you estimate what percentage of time you spent on the counterclaims, work on
the counterclaims, versus the claim brought by Foscaldo on the note, and an
approximation is fine?
A – As I sit here, I don't think I could do that.
Q – Well, you'd agree with me, would you not, that it was at least 50 percent of your
time?
ARROWOOD: Objection.
A – That's really difficult for me to do, because to me, you know. I'm sorry, go ahead.
Q – For instance, you did a lot of work, looking at the billing statements, of various
statements that you put together, to be part of oppositions to motions to dismiss and also
to demonstrate to the court the wrongdoing alleged by Smith, is that right?
A – True.
Q – And the counterclaims relating to Foscaldo's purported misconduct required factual
investigation; did they not?
A – Correct.
Q – And there was time and expense spent toward investigating those issues, right?
A – True.
Q – As you sit here today, you're just not able to give even a rough estimate of the
amount of time allocated between the counterclaims and the issues related to the Note?
A – I don't think I could fairly do that, no.

155.     Zayotti acted with malice when he willfully concealed or deliberately ignored the

fact that at least fifty percent of the time he billed on *Foscaldo* was spent investigating

and developing the eleven counterclaims, a fact that was or would have been known to

him had he not consciously disregarded it. By refusing to provide even a rough estimate

of the time he spent on those claims, which were not recoverable damages in *Smith*,

Zayotti materially contributed to the malicious prosecution of Plaintiff. His improper

purpose for not proving the requested estimate was to conceal his role in the fraud.

156.     Zayotti caused damages to Plaintiff by imposing legal and other costs on him that

would have been avoided had he testified forthrightly about his work on the

counterclaims.

### Concealed or Ignored Smith's Second Default

157.     In *Foscaldo*, the court found that Smith defaulted twice on the Note. In November

2011, he defaulted when AM-PM terminated Foscaldo, without cause. In January 2012,

Smith defaulted when he failed to make the first payment directly to Foscaldo. According

to the court, "This [second] default constitutes an independent ground for accelerating

[full] payment [of the Note]."

158.     Zayotti was well aware of the *Foscaldo* decision. He represented Smith and AM-

PM and argued in opposition to Foscaldo's motion for summary judgment. On November

20, 2012, he filed Smith's emergency motion for reconsideration, which was denied by

the court on January 18, 2013.

159.     In March 2015, Zayotti testified about the application and effect of the *Foscaldo*

decision:

Q – And the letter [from Foscaldo's counsel dated January 9, 2012] indicates that by
failing to pay the first installment payment on the Note on January 6, 2012, was a further
default of the Note, he contends that, does he not?
ARROWOOD: Do you want to tell us exactly what you're looking at?
Q – In the second paragraph, he's describing what he says is the provision as to how
payments are supposed to be made under the Note. I'll read it: "[Smith's] payment
requirements are specifically set forth in the Note: Payments under this Note shall be
made by personal check or wire transfer to such account of [Foscaldo's] as [he] may
designate in writing from time to time." Right?
A – Correct.
Q – And then he goes on, "payment of $112,500 to [Paster] on January 6th does not
constitute payment under the Note." Right?

31

A – Correct.

Q – And he's saying the payment should be sent directly to [Foscaldo's] home address, right?

A – Correct.

Q – And so one of the issues you had researched, and weren't able to get a firm conclusion on, if I have your testimony right, was whether or not payments to an escrow agent would be sufficient to satisfy the payment obligation under the Note, is that right?

A – That's correct.

Q – And in fact, one of the arguments that [Foscaldo's counsel] made in front of the Superior Court at the time of summary judgment was that the failure to make the payment on January 6th was an independent and additional default by Smith?

A – That may be true. I mean, if he argued it, I'm sure it's in his brief.

Q – Fair enough. But do you recall that was actually a finding by the judge? That she found that the failure to make the payment on January 6th was an independent default?

A – Well, I believe that's true. If it's in the decision, I mean, the decision speaks for itself.

Q – Speaks for itself?

A – So if it's in there, it's in there, and I believe it is in there.

ARROWOOD: Let's not go drag out the decision and make him read that out loud.

WEIGAND: I may just do that.

ARROWOOD: It's ten after six.

WEIGAND: I have nothing further.

ARROWOOD: I have nothing further, either.

160.    Zayotti acted with malice when he willfully concealed or deliberately ignored the fact that Smith defaulted twice on the Note, a fact that was or would have been known to him in January or November of 2012, had he not consciously disregarded it.

161.    By concealing or deliberately ignoring Smith's second default, Zayotti materially contributed to the malicious prosecution of Plaintiff. His improper purpose for not disclosing the malicious prosecution was to conceal his role in the fraud.

162.    Zayotti caused damages to Plaintiff by imposing legal and other costs on him that would have been avoided had he not willfully concealed or deliberately ignored Smith's second default on the Note.

163.    As an officer of the court, Zayotti had a duty to disclose the malicious prosecution and his client's and "former" clients' fraud to the Superior Court and Plaintiff.

**Kayatta**

164.     On September 3, 2013, Paster and PRC filed their Answers in *Smith*.

165.     On September 4, 2013, Kayatta attempted to file an Amended Complaint.

166.     On November 18, 2013, Kayatta filed the Amended Complaint.

167.     On December 3, 2013, Plaintiff was served with the Amended Complaint.

**No Probable Cause**

168.     Kayatta signed the Amended Complaint and otherwise materially contributed to the malicious prosecution of Plaintiff. Kayatta willfully concealed or deliberately ignored the fact that, as a matter of law, there was no probable cause for her clients' claims against Plaintiff.

169.     As the signing attorney, prior to filing the Amended Complaint, Kayatta had a duty to investigate the facts and law supporting the claims against Plaintiff. In November 2013, when she filed the Amended Complaint, Kayatta was counsel to Smith and AM-PM in *Foscaldo*, and she was aware of the *Foscaldo* decision, which she cites in the Amended Complaint. In November 2012, the Superior Court found in *Foscaldo* that nothing in the record suggests that AM-PM and Foscaldo intended that the Addendum modify the Note.

170.     In November 2013, Kayatta knew of the Superior Court's order ("Order") denying Smith's motion for emergency reconsideration. In January 2013, the court ruled that Smith and Foscaldo did not intend that the Note be read together with other documents, such as the Addendum. The court held that the Note sets forth the entire agreement between Smith and Foscaldo and it provides that Smith's obligations are absolute and unconditional.

33

171.     In light of the Superior Court decision and Order, on December 3, 2013, when she

caused Plaintiff to be served with the Amended Complaint, Kayatta could not, as a matter

of fact or law, have reasonably believed that her clients had a claim against Plaintiff for

his work on the Addendum.

172.     Kayatta knowingly initiated and continued the *Smith* litigation against Plaintiff

without probable cause and for an improper purpose.

**Malice (Improper Motive)**

Failed to Conduct Due Diligence

173.     Kayatta acted with malice when, prior to filing the Amended Complaint, she

either failed to conduct any meaningful due diligence or she willfully concealed or

deliberately ignored the law and facts which would have been known to her had she not

consciously disregarded them.

174.     Kayatta had an improper purpose in bringing and continuing *Smith*. She filed the

Amended Complaint even though she knew or deliberately ignored the fact that the

claims against Plaintiff were without legal or factual support. She did so willfully,

knowingly and maliciously to harass Plaintiff and extort money from him.

175.     As the signing attorney, prior to filing the Amended Complaint, Kayatta had a

duty to investigate the facts supporting the claims against Plaintiff. As to AM-PM's claim

for malpractice, Kayatta either failed to conduct any meaningful pre-filing inquiry or she

willfully concealed or deliberately ignored the facts which would have been known to her

had she not consciously disregarded them.

176.     As the signing attorney, prior to filing the Amended Complaint, Kayatta had a

duty to discuss the preparation of the Addendum with Shay. Kayatta had one or more

contacts with Shay prior to his deposition. Had she discussed the preparation of the Addendum with him, prior to filing the Amended Complaint, she would have learned from Shay what he later testified to at his deposition, including:

Shay signed an affidavit for Zayotti and was scheduled to be deposed in *Foscaldo*; Shay was the only representative of AM-PM to work with Plaintiff on the Addendum; the terms of the Addendum were negotiated before Plaintiff was engaged; Plaintiff's engagement was limited to a couple of hours; Plaintiff was retained to document the Addendum based on the terms sheet he was given; Shay did not retain Plaintiff to represent Smith; Smith did not tell Shay about the Note; Shay did not retain Plaintiff to review the Note or the SPA; and, Shay did not discuss with Plaintiff the fact that the EA referred to the SPA or the Note.

177.       As the signing attorney, prior to filing the Amended Complaint, Kayatta had a duty to discuss the preparation of the Addendum with Zayotti. Had she done so, she would have learned from Zayotti what he later testified to at his deposition, including:

That he prepared Shay's affidavit, which describes Foscaldo's non-performance and the negotiation and preparation of the Addendum; and, that he had one phone call with Plaintiff, but did not follow up with, depose or name him as a defendant in *Smith*.

178.       Kayatta acted with malice when, prior to filing the Amended Complaint, she either failed to conduct any meaningful due diligence or she willfully concealed or deliberately ignored: the *Foscaldo* decision and Order; Shay's affidavit; the scope of Plaintiffs' engagement; that Smith did not disclose the Note to Shay; and, that Zayotti had one phone call with Plaintiff but did not follow up, depose or name him as a defendant in *Smith*.

179.       By failing to conduct any meaningful pre-filing due diligence, or by willfully concealing or deliberately ignoring the facts and law which would have been known to her had she not consciously disregarded them, Kayatta materially contributed to the malicious prosecution of Plaintiff. She did so to harass Plaintiff and extort money from him.

35

180.    Kayatta caused damages to Plaintiff by imposing legal and other costs on him that

would have been avoided had she actually conducted meaningful pre-filing due diligence

or not willfully concealed or consciously disregarded the facts and law which would

otherwise have been known to her.

Prepared and/or Served Smith's False Answers

181.    In January 2015, Kayatta acted with malice when she knowingly served Smith's

false Answers to Plaintiff's interrogatories.

182.    Kayatta prepared Smith's Answers or assisted him with the preparation of his

Answers.

183.    In his Answers, Smith states, under oath, that "AM-PM and I, through Shay,

engaged [Plaintiff];" "[Plaintiff] represented AM-PM and me;" and "[Plaintiff] advised

AM-PM and me."

184.    In February 2015, Shay testified that he retained Plaintiff solely to represent AM-

PM.

185.    In March 2015, Smith testified that he never met or spoke with Plaintiff and that

Shay was not authorized to retain Plaintiff for him.

186.    In his Answers, Smith states, under oath, that: "The goal of changing Foscaldo's

[EA] was to make it easier for AM-PM to terminate Foscaldo, without any undue

consequences for Smith or AM-PM."

187.    Kayatta knowingly served Smith's false Answers. When she filed the Amended

Complaint, Kayatta knew that Shay retained Plaintiff solely for AM-PM. If Kayatta had,

in fact, believed that Plaintiff represented Smith, she would have named Smith as a

plaintiff in Count VI (Legal Malpractice) of the Amended Complaint.

188.     By offering evidence she knew was false, Kayatta materially contributed to

Smith's malicious prosecution of Plaintiff. She did so to harass Plaintiff and extort money

from him.

189.     Kayatta caused damages to Plaintiff by imposing legal and other costs on him that

would have been avoided had she not knowingly served Smith's false Answers.

Prepared and/or Served AM-PM's False Answers

190.     In January 2015, Kayatta acted with malice when she knowingly served AM-

PM's false Answers to Plaintiff's interrogatories.

191.     Kayatta prepared AM-PM's Answers or assisted Smith with the preparation of

AM-PM's Answers.

192.     In Answer 13, Smith, for AM-PM states, under oath, that: "The goal of changing

Foscaldo's [EA] was to make it easier for AM-PM to terminate Foscaldo, without any

undue consequences for Smith or AM-PM."

193.     In Answer 6, Smith, for AM-PM, states under oath: "In September 2013, AM-PM

employee Beauregard exchanged emails with Shay. Shay replied that the clear intention

of changing the [EA] was to make it so both parties could terminate [it] and there would

be no acceleration [of the Note]."

194.     No such "email exchange" was produced by AM-PM or Beauregard.

195.     Kayatta knowingly served AM-PM's false Answers. When she served AM-PM's

Answers, Kayatta knew that AM-PM was not a party to the Note and, thus, it had no

authority to change the Note. Moreover, three days before he was terminated, Foscaldo,

who was a party to the Note, rejected Smith's request to change it.

196.     When she served AM-PM's Answers, Kayatta knew that AM-PM could have no

intention, "clear" or otherwise, that the Addendum would change the Note. Kayatta knew

that Shay was the only representative of AM-PM to work with Plaintiff and that Shay had

no knowledge of the Note. With respect to the Addendum, because Shay had no

knowledge of the Note, AM-PM could have no knowledge of it, or intention to change it.

197.     When she served AM-PM's Answers, Kayatta deliberately ignored the *Foscaldo*

decision. In *Foscaldo*, Smith argued that the Addendum modified the acceleration clause

of the Note. The court, however, found "no legal basis" for Smith's position:

> Smith signed the Note in his individual capacity. He is not a party to either the [EA] or
> the Addendum. Nothing in the record suggests the parties [to the Addendum] intended
> this result.
>
> Smith ignores the fact that the Note relates to his purchase of Foscaldo's stock and not to
> the governance of [AM-PM]."

198.     When she served AM-PM's Answers, Kayatta deliberately ignored the Superior

Court's Order on Smith's emergency motion for reconsideration. In January 2013, that

court held that Smith's obligations under the Note were "absolute and unconditional" and

that Smith and Foscaldo did not intend that the Note be read together with other

documents, such as the Addendum.

199.     When she served AM-PM's Answers, Kayatta deliberately ignored the binding

effect of the *Foscaldo* decision and Order. The Superior Court's findings, which were

central to AM-PM's claim against Plaintiff, and, upon which a judgment was entered,

were binding on Smith and AM-PM.

200.     By knowingly serving AM-PM's false Answers, Kayatta materially contributed to

AM-PM's malicious prosecution of Plaintiff. She did so to harass Plaintiff and extort

money from him.

201.     Kayatta caused damages to the Plaintiff by imposing legal and other costs on him

that would have been avoided had she not knowingly served AM-PM's false Answers

and deliberately ignored the *Foscaldo* decision and Order.

Failed to Produce Shay's Affidavit

202.     Kayatta acted with malice when she concealed or deliberately ignored Shay's

affidavit.

203.     In March 2012, Zayotti prepared Shay's affidavit. In October 2013, he transferred

his *Foscaldo* files to AP.

204.     Kayatta had a duty to produce Shay's affidavit. In November 2014, AM-PM was

served with Plaintiff's request ("Request") for all documents relating to Foscaldo's

termination. The Request sought "all documents in your possession, custody or control,

including all documents that are in the custody of your employees or attorneys."

205.     In December 2014, Kayatta, for AM-PM, responded that "AM-PM undertook a

diligent search for responsive documents in locations where such documents were

reasonably likely to exist." However, Kayatta produced no documents relating to

Foscaldo's termination on the grounds that Request No. 4 "is overly broad, unduly

burdensome, relates to confidential information, and documents were produced in

response to Paster's request."

206.     Shay's affidavit does not contain "confidential information." It is a public document which was filed by Zayotti with the Superior Court in July 2012. Moreover, Shay's affidavit was not produced in response to Paster's request.

207.     The Plaintiff's Request was not "overly broad or unduly burdensome." Shay's affidavit was relevant to Foscaldo's termination and deeply probative of AM-PM's claim against Plaintiff. It was, arguably, the principal document in AM-PM and/or AP's possession describing AM-PM's position regarding Foscaldo's non-performance, termination and the preparation of the Addendum. In his affidavit, Shay states:

> In November 2010, I replaced [Foscaldo] as [GM] of AM-PM, at which time he was moved to a sales role. [Foscaldo] made little effort to perform his new duties. I spoke with him about his non-performance and he admitted 'it was the first time in his career he was not earning his pay'. Prior to the [Addendum], although I believed there was cause to terminate [Foscaldo], I was concerned that terminating [him] for cause would inevitably lead to litigation against AM-PM.

208.     In his affidavit, Shay also states, that, at the time the Addendum was prepared, he was not aware of Smith's Note; and, that it was never intended that the exercise of AM-PM's right under the Addendum to terminate Foscaldo, without cause, would accelerate Smith's Note.

209.     Plaintiff's Request defines "document" to include "witness statements." In February 2015, Arrowood represented Shay at his deposition. Prior to his deposition, Kayatta and/or Arrowood had one or more contacts with Shay.

210.     When she served AM-PM's Response, Kayatta concealed or deliberately ignored Shay's affidavit, which would have been known to her had she not consciously disregarded it. By obstructing the Plaintiff's access to exculpatory evidence, Kayatta materially contributed to AM-PM's malicious prosecution of Plaintiff. She did so to harass Plaintiff and extort money from him.

211.      Kayatta caused damages to Plaintiff by imposing legal and other costs on him that

would have been avoided had she produced Shay's affidavit in response to the Request.

Failed to Disclose Her Clients' Fraud

212.      In March 2012, Zayotti prepared Shay's affidavit in connection with *Foscaldo*.

213.      During *Smith*, Zayotti represented Beauregard. He provided her with legal advice

and had email and verbal contact with her.

214.      Beauregard learned from Zayotti that AM-PM retained Plaintiff to prepare the

Addendum. In September 2013, Beauregard "exchanged emails" or had a "follow up

conversation" with Shay about the "clear intention" of the Addendum.

215.      In October 2013, Kayatta appeared in *Foscaldo* and Zayotti transferred possession

to AP of his *Foscaldo* case files, which included Shay's affidavit.

216.      After Zayotti withdrew from *Foscaldo*, and while he was representing

Beauregard, the *Smith* plaintiffs and their AP attorneys continued to rely on Zayotti and

sought his advice and counsel because of his long historic participation in the case.

217.      The transfer of the *Foscaldo* case involved a good deal of transition work. There

were many conversations between Zayotti and AP attorneys relating to that transition and

requesting information from him.

218.      In January 2015, when she prepared or is assisted Smith with the preparation of

Smith's and AM-PM's Answers,  Kayatta willfully concealed or deliberately ignored the

fact that Smith and AM-PM's false Answers were conjured from Shay's affidavit

(Emphasis below Added):

In March 2012, Shay stated, under oath, that: "The intention in entering into the
Addendum was to enable either party [AM-PM or Foscaldo] to terminate [Foscaldo],
with or without cause, at any time *without any adverse consequences to any party.*"

41

In January 2015, Smith, for himself and AM-PM, stated, under oath, that: "The goal of changing Foscaldo's [EA] was to make it easier for AM-PM to terminate Foscaldo, *without any undue consequences for John Smith or AM-PM.*"

In March 2012, Shay stated, under oath, that: "*It was clearly never the intention* of the parties to amend the [EA] to give AM-PM the right to terminate [Foscaldo] without cause and thereby trigger [*if* Foscaldo were later terminated without cause] an immediate obligation on the part of Smith."

In January 2015, Smith stated, under oath, for AM-PM that: "In September 2013, AM-PM employee [Beauregard] exchanged emails with [Shay]. [Shay] replied that *the clear intention of changing the* [EA] *was to make it so both parties could terminate* [it] *and there would be no acceleration* [of Smith's Note]."

In March 2012, Shay stated, under oath, that: "*AM-PM retained [Plaintiff].*"

In January, 2015, Smith stated, under oath, that: "[Plaintiff] represented AM-PM *and me.*"

219.     If Kayatta actually believed that Smith's Answers were true, she would have

named him with AM-PM in its claim against Plaintiff for malpractice.

220.     In February 2015, Kayatta acted with malice when she willfully concealed or

deliberately ignored the fact that Beauregard's testimony about her "email exchange" or

"follow-up conversation" with Shay regarding the purpose of the Addendum was actually

conjured from Shay's affidavit:

Q – Would you describe [AM-PM's Answer] as a fair representation of [Shay's] response to your email?
A - "Yes. That's what he said."
Q – Is [AM-PM's Answer] a direct quote from [Shay's] email?
KAYATTA: If you know.
A- "I don't remember if that's a direct quote or not."
Q – Was this email exchange produced in your document production?
A – I don't know. I don't know whether this was a follow up conversation or if this was an e-mail. I do remember [Shay] saying that the clear intention of the [Addendum] was to make it so that both parties could terminate the agreement without any acceleration or other negative consequence."
Q – Or other negative consequence?
A – Yeah. If Foscaldo wanted to keep some of his little perks – I don't remember whether it was his car or his insurance or something, and there were a few little things like that. But the main thing was – yeah.

Q – Let me ask you this: Do you know if Shay – let me back up. Do you have any knowledge as to whether or not Shay was ever provided with the employment agreement, the note, and the –
A – I have no idea.
Q – You have no idea? What did you take it to mean from Shay's email that there would be no acceleration?
A – Exactly what it says.
Q – Acceleration of what?
A – Of the note.
Q – But you're not aware of whether or not Shay was even aware of the note, are you?
KAYATTA: Objection as to form.
A – I can't say what Shay was or was not aware of. I can only say what was the gist of the conversation.

221.     Shay testified that he did not tell Beauregard or Plaintiff that the intention of the

Addendum was to permit either party to terminate Foscaldo's EA, without accelerating

the Note.

222.     Kayatta was present at Beauregard's deposition when she testified that Plaintiff

represented Smith:

Q – Do you know if your husband was represented by an attorney with respect to the Addendum?
A – I know now that he was represented by [Plaintiff].
Q – How did you come by that knowledge?
A – Because [Plaintiff] represented AM-PM, and my husband signed it. [Plaintiff] was the one that constructed this document from what I was – from what I understand.
Q – Is it your understanding that [Plaintiff] represented your husband, personally?
A – It is my understanding that my husband was being represented personally and AM-PM.

223.     If Kayatta actually believed that Beauregard's testimony were true, she would

have named Smith with AM-PM in its claim against the Plaintiff for malpractice.

224.     Smith's testimony directly contradicted Beauregard's. Smith testified that he

never met or spoke with Plaintiff and did not authorize Shay to retain Plaintiff for him.

Smith distanced himself from the Addendum: "I was in New Hampshire at the time so I

wasn't really involved in [the Addendum] that much."

225.     Kayatta was present at Zayotti's deposition when he testified about Shay's affidavit.

226.     Kayatta may have had many other undisclosed conversations with Zayotti, Beauregard or Shay about his role in the preparation of the Addendum. From November 2013 through March 2014, AP billed Smith for services "in reference to J. Kenneth Foscaldo." However, before producing those billing records, AP redacted the entire description of services in all of AP's invoices.

227.     Kayatta deliberately concealed the entries showing the name of the service provider and the nature of services performed in all of AP's invoices. As a result, it is unknown which AP attorney performed what services for Smith and whether or not some of those services involved discussions Kayatta had with Zayotti, Beauregard, Shay or others regarding the preparation of the Addendum or Shay's affidavit.

228.     Although she signed the Amended Complaint in *Smith*, which added Beauregard and her personal claim for loss of consortium to the case, in March 2015, after Zayotti's deposition, Kayatta appeared in *Smith* as "Private Counsel for Beauregard."

229.     Kayatta willfully concealed or deliberately ignored the fact that her clients' false Answers and testimony were conjured from Shay's affidavit, a fact that would have been known to her had she not consciously disregarded it. By failing to disclose that fact, Kayatta materially contributed to her clients' malicious prosecution of Plaintiff.

230.     As an officer of the court, Kayatta had a duty to disclose her clients' fraud to the Superior Court and Plaintiff.

231.     Kayatta caused damages to Plaintiff by imposing legal and other costs on him that would have been avoided absent her failure to disclose her clients' fraud.

**Lisa G. Arrowood**

232.     Between May 10, 2013 and September 4, 2013, Arrowood was engaged by Smith, AM-PM and Beauregard to represent them in the *Smith* litigation.

233.     On October 7, 2013 Arrowood appeared in *Foscaldo* and was involved in that case until January 30, 2014, when the parties executed a "settlement" agreement.

234.     On October 17, 2013, with the filing of the Motion to Amend the Complaint, Arrowood appeared in *Smith*.

**No Probable Cause**

235.     As the senior attorney on the *Smith* engagement, Arrowood had direct managerial and supervisory authority over Kayatta, and knowledge of her work and conduct. Either by failing to review the Amended Complaint, directing the preparation and filing of it, or by ratifying it, Arrowood is responsible for Kayatta's improper conduct as if it were her own.

236.     Arrowood ignored, directed or ratified the preparation and filing of the Amended Complaint and otherwise materially contributed to the malicious prosecution of Plaintiff. In November 2013, when the Amended Complaint was filed, Arrowood willfully concealed or deliberately ignored the fact that, as a matter of law, there was no probable cause for her clients' claims against Plaintiff.

237.     As the senior attorney on the *Smith* engagement, Arrowood had a pre-filing duty to review the Amended Complaint. In November 2013, when the Amended Complaint was filed, Arrowood was counsel to Smith and AM-PM in *Foscaldo*, and she was aware of the *Foscaldo* decision.

45

238.     In November 2013, when the Amended Complaint was filed, Arrowood willfully concealed or deliberately ignored the fact that the Superior Court had found that Smith was not a party to the Addendum and that the parties to the Addendum did not intend that it modify the Note.

239.     In November 2013, when the Amended Complaint was filed, Arrowood was aware of the Superior Court Order on Smith's motion for emergency reconsideration. In January 2013, the Superior Court ruled that Smith and Foscaldo did not intend that the Note be read together with any other document, such as the Addendum. The court ruled that "The Note sets forth the entire agreement and provides that Smith's obligations are absolute and unconditional."

240.     In light of the Superior Court's decision and Order, on November 18, 2013, when the Amended Complaint was filed, Arrowood could not, as a matter of law, have reasonably believed that AM-PM, Smith or Beauregard had a claim against Plaintiff for his work on the Addendum.

241.     Arrowood knowingly initiated and continued the *Smith* litigation against Plaintiff without probable cause and for an improper purpose.

## Malice (Improper Purpose)

Failed to Re-evaluate Her Position

242.     Arrowood acted with malice when she repeatedly failed to review, examine and re-evaluate her clients' claims against Plaintiff.

243.     By willfully and deliberately ignoring the facts, which would have been known to her had she not consciously disregarded them, Arrowood materially contributed to her clients' malicious prosecution of Plaintiff.

46

244.    Arrowood represented Shay at his deposition. When Shay was asked about

Beauregard's testimony regarding the "clear intention" of the Addendum, Arrowood cut

him off:

> Q - Did you tell [Plaintiff] that the clear intention of changing Foscaldo's contract was to
> make it so both parties could terminate it and there would be no acceleration?
> A – I don't know what was in [Beauregard's] email, but the answer is no. There was…
> ARROWOOD:  I think – have you finished your answer?
> A – I think I'm finished with my answer.

245.    When Shay testified that the Addendum could not achieve Beauregard's "clear

intention," Arrowood objected, then attempted to coach Shay:

> Q – Given that [Foscaldo and Smith] were the parties to the Note, was it even possible for
> the parties to the employment agreement [AM-PM and Foscaldo] to "make it so both
> parties could terminate the [EA] and there would be no acceleration" of the Note?
> ARROWOOD: Objection to the form and objection because it calls for a legal conclusion
> and this gentleman is not a lawyer and he's not an expert. You may answer if you can,
> but if you can't, tell him.
> A – Entities or individuals that are not parties to agreements cannot take actions on
> agreements that they are not parties to.

246.    In November 2014, AM-PM was asked to identify its expert witnesses, the subject

matter on which each would testify and the grounds for each opinion. In January 2015,

AM-PM replied that it had "not yet made determinations with respect to testifying expert

witnesses but will seasonably supplement its response."

247.    AM-PM failed to disclose its expert witnesses prior to the close of discovery. A

claim for legal malpractice cannot succeed without expert testimony as such claims are

not within the purview of a lay person.

248.    As to AM-PM's claim for malpractice, no expert opinion could alter the binding

effect on AM-PM of the *Foscaldo* decision and Order.

249.    In Arrowood's presence (and Smith's) Shay testified that:

He did not engage Plaintiff to represent Smith; the Addendum was Smith's idea; Smith directed him to retain Plaintiff to prepare the Addendum; he did not tell Plaintiff that the goal of the Addendum was to make it easier for AM-PM to terminate Foscaldo, without undue consequences to Smith or AM-PM; and, he did not tell Plaintiff that the purpose of the Addendum was to change Foscaldo's EA to ensure his smooth termination from AM-PM.

"From my perspective, there was never, ever, ever, ever any intention whatsoever that Foscaldo would be able to accelerate the Note. I had no knowledge of the Note. The concept of a related document with an acceleration clause was never even in my mind."

He discussed the draft Addendum with Smith to see if he was okay with it.

He signed an affidavit for Zayotti and his deposition was scheduled in *Foscaldo* but not taken.

250.    Arrowood represented Smith at his deposition. In her presence, Smith testified that:

He never met or spoke with Plaintiff and that Shay was not authorized to retain Plaintiff for him.

He never discussed with Shay the conversations Shay had with Plaintiff about the Addendum; and, he did not tell Shay about the SPA or the Note and did not instruct Shay to have Plaintiff review them.

He did not read the Addendum before signing it.

251.    When she represented Smith and Shay at their depositions, Arrowood willfully and deliberately ignored numerous exculpatory facts, which would have been known to her, had she not consciously disregarded them. By repeatedly ignoring the fact that her clients' claims were without merit, Arrowood materially contributed to their malicious prosecution of Plaintiff.

252.    Arrowood caused damages to the Plaintiff by imposing legal and other costs on him that would have been avoided absent her failure to continually review, examine and re-evaluate her clients' claims against Plaintiff.

Concealed or Ignored Binding Authority

253.     Arrowood acted with malice when she willfully concealed or deliberately ignored

the *Foscaldo* findings and Order.

254.     In November 2013, when the Amended Complaint was filed, Arrowood was

counsel to AM-PM in *Foscaldo* and was aware of the *Foscaldo* decision. She willfully

concealed or deliberately ignored the court's findings that:

Smith was not a party to the Addendum. The parties to the Addendum did not intend that
it modify the Note.

Smith's failure to make the first Note payment directly to Foscaldo was a second default
and an independent ground for Foscaldo to demand full payment of the Note.

Smith and Foscaldo did not intend that the Note be read together with other documents,
such as the Addendum.

255.     Arrowood willfully concealed or deliberately ignored the Superior Court's

findings, which would have been known to her had she not consciously disregarded them.

By concealing or ignoring the court's findings and their binding effect on Smith and AM-

PM, Arrowood materially contributed to her clients' malicious prosecution of Plaintiff.

256.     Arrowood caused damages to Plaintiff by imposing legal and other costs on him

that would have been avoided had she not willfully concealed or deliberately ignored the

court's findings, which would have been known to her had she not consciously

disregarded them.

Tainted Zayotti's Testimony

257.     Arrowood acted with malice when she willfully and deliberately sought to

influence, and, thereby, taint, Zayotti's testimony.

258.     On February 17, 2015, Zayotti was subpoenaed by Paster. Although she did not

represent him, Arrowood spoke with Zayotti that day and informed him that his

deposition would be rescheduled.

259.     Arrowwood had three or more *exparte* conversations with Zayotti after he was

subpoenaed. Her private conversations influenced Zayotti's testimony and obstructed

Plaintiffs' access to his untainted evidence.

260.     At his deposition, Zayotti testified about his February 17 phone call with

Arrowood. "We may have briefly touched upon whether I recalled the conversation I had

with Paster about the acceleration clause, we may or may not have talked about that."

When asked if Arrowood raised the acceleration clause, Zayotti answered, "I believe so,

if it was."

261.     Three days before his deposition, Arrowood had a phone call with Zayotti for

close to an hour. With Arrowwood leading the discussion, Zayotti was asked about the

affidavits he prepared, whether or not Paster provided him with certain emails and about

the discussions he had with Paster about the acceleration clause.

262.     During a break in his deposition, Arrowood and Kayatta met privately with

Zayotti. After the break, Zayotti had trouble recalling what they had just discussed.

Q – Did [Arrowood] tell you what she was going to ask you regarding [the tender of the
Note payment in escrow]?
A – No.
ARROWOOD: "In a few minutes, you'll know exactly what I'm going to ask him."
Q – Okay, so she gave you a heads up of what's coming.
A – Well, she didn't tell me the specific questions - -
ARROWOOD: The coming attractions.
A - - but she told me the topics she was going to ask me about.

263.      At a minimum, Arrowood's deceitful conduct created the appearance of witness
tampering and undermined the integrity of the adjudicative process. By initiating and
participating in *exparte* discussions with Zayotti before and during his deposition,
Arrowood influenced and tainted his testimony, thereby materially contributing to her
clients' malicious prosecution of Plaintiff.

264.      Arrowood caused damages to the Plaintiff by imposing legal and other costs on
him that would have been avoided had she not willfully and deliberately obstructed
Plaintiff's access to Zayotti's untainted testimony.

Abuse of Attorney-Client Privilege

265.      Arrowood acted with malice when she knowingly and repeatedly asserted
improper claims of attorney-client privilege to deprive Plaintiff of the means to defend
his rights and reputation.

266.      Arrowood knowingly and repeatedly asserted improper claims of attorney-client
privilege with respect to conversations:

A. Zayotti had with Arrowood in connection with the *Foscaldo* and *Smith* lawsuits:

Obviously, it goes without saying that my clients are asserting the attorney client
privilege with respect to any conversation that you and I may have had in connection
with my representation of our mutual clients in either the *Foscaldo* lawsuit or the
[*Smith*] lawsuit.

B. Zayotti had with AP Attorneys:

I'm going to object, and on behalf of my clients, assert the privilege. Let me just state
for the record that Zayotti had been involved in a long, complex piece of litigation
which, although we took it over, involved a good deal of transition work. And there
were many conversations between Zayotti and, you know, attorneys in our office,
relating to that transition, and requesting information of him, and so on, and I think
it's all privileged.

C. Zayotti had with Smith, Beauregard and AM-PM:

51

Well, I'm just going to object and put on the record the fact that, while he may have withdrawn his appearance, because of the complexity of the case, there were many occasions after our firm filed its appearance that both we and the clients continued to rely on him, and sought his advice and counsel because of his long historic participation in the case. So there may be privileged communications seeking legal advice from him, even though he'd withdrawn his appearance.

D. Zayotti had with Shay.

E. Smith had with Shay about legal advice Smith sought from Plaintiff.

F. Shay had with the Plaintiff:

So to the extent you're going to ask him questions about his conversations with [Plaintiff], I'm going to instruct him not to answer. He is not a party to this lawsuit, so the privilege he has with [Plaintiff] is not waived.

G. Zayotti had with Smith about the Non-Compete:

Q- Did you have a discussion with Smith about whether he understood that the non-compete would cease if there was a failure to make a payment under the Note?
A – Yes.
Q – Do you know how many times you discussed that issue with Smith?
A- No. I don't.
Q – What did Smith tell you?
ARROWOOD: I'm asserting the privilege.
Q – Note our objection on the basis of at issue.

H. Zayotti had with Smith about the Agreements:

Q – During the course of your representation, did you have conversations with Smith about his understanding of the Agreements?
A – Yes.
Q – How many times?
A – Numerous
Q – What, if anything, did he tell you about his understanding?
ARROWOOD: Okay, I'm done. My clients will assert the privilege on that.
Q - Same. I don't want to belabor the record. I'm going to ask a series of similar questions here, and we'll just reserve. Your objection is understood and my position is understood.

I. Zayotti had with Smith about the Note, the acceleration clause, the SPA and the closing of the Smith-Foscaldo transaction.

J. Zayotti had with Smith about Foscaldo's demand that the first Note payment be made directly to him.

267.     The rule of privilege does not apply where it would be a manifest injustice to allow the client to claim the privilege or when it would deprive an attorney of the means of defending his rights and reputation. Whenever a client imputes the good faith of its attorney, the cloak of privilege drops so far as necessary to enable the attorney to defend his conduct.

268.     Arrowood acted with malice when she knowingly and repeatedly asserted improper claims of attorney-client privilege to deprive Plaintiff of the means to defend his reputation, his ability to exercise his property rights and his right to be free from unjustifiable litigation.

269.     Arrowood threatened Plaintiff's livelihood and the means to provide for his family. By doing so, she materially contributed to her clients' malicious prosecution of him. She did so to harass Plaintiff and extort money from him.

270.     Arrowood caused damages to the Plaintiff by imposing legal and other costs on him that would have been avoided had she not obstructed his access to exculpatory evidence by knowingly and repeatedly asserting improper claims of attorney-client privilege.

271.     As an officer of the court, Arrowood had a duty: (a) not to obstruct Plaintiff's access to evidence and (b) not to engage in conduct involving fraud or deceit.

Attempted Extortion

272.     Arrowood acted with malice when she willfully and deliberately attempted to extort money from Plaintiff.

273.     On March 6, 2015, immediately after Zayotti's deposition, Arrowood proposed that the parties engage a mediator. On March 17, 2015, Arrowood was served with the

53

Plaintiff's motion for summary judgment. On March 24, 2015, the *Smith* parties (other than Plaintiff) and/or their attorneys participated in a mediation session conducted by an attorney proposed by Arrowood.

274.    On March 25, 2015, Arrowood emailed Plaintiff's attorney: "I left you a voice mail this morning with a $50,000.00 settlement demand. My clients will give your client 24 hours to make a counteroffer. Once they have to pay for us to oppose your motion for summary judgment, that offer will be off the table." That day, Plaintiff's attorney replied: "No, my client will not meet the demand and does not have a counter offer."

275.    On May 6, 2015, Arrowood declined to include the following sentence in Smith's proposed stipulation of dismissal with Paster and PRC: "Notwithstanding anything to the contrary herein, [Langan] does not release any claims against the Plaintiffs and/or their attorneys for his attorney's fees and costs related to this action that may be available to him under Massachusetts law."

276.    As an advocate and officer of the court, Arrowood had a duty: (a) not to continue an action without a basis in law and fact for doing so; (b) not to abuse legal procedure; (c) to withdraw, correct or disclose her clients' false evidence; and (d) to correct or disclose her clients' fraud to the Superior Court and Plaintiff.

277.    Arrowood's "settlement demand" abused the court's procedural rule to achieve an improper, ulterior purpose. Although she knew there was no probable cause for her clients' claims against Plaintiff, Arrowood perverted the court's rule in an attempt to extort money from him.

278.    By willfully, intentionally and maliciously attempting to extort money from Plaintiff, Arrowood materially contributed to her clients' malicious prosecution of him.

279.     Arrowood caused damages to Plaintiff by imposing legal and other costs on him

that would have been avoided had she not initiated and continued the malicious

prosecution against him for the improper purpose of harassing and attempting to extort

money from him.

Second Count for Relief
**Violations of RICO**

280.     Plaintiff incorporates by reference in this count all allegations contained in this

Complaint.

281.     This Count is a claim for civil relief under Title IX of the Organized Crime

Control Act of 1970, "Racketeer Influenced and Corrupt Organizations," 18 U.S.C.

Sections 1961 *et seq.* ("RICO"). The court has jurisdiction of this claim pursuant to 18

U.S.C. Section 1964(c) and 28 U.S.C. Section 1331.

**Prohibited RICO Activity
18 U.S.C., Section 1962(c)**

282.     This Count alleges violations of 18 U.S.C., Section 1962(c) against the

Defendants. Under Section 1962(c), it is unlawful for "any person associated with any

enterprise …to conduct or participate, directly or indirectly, in the conduct of such

enterprises' affairs, through a pattern of racketeering activity."

**Person
18 U.S.C., Section 1961(3)**

283.     Each of the Defendants is a "person" within the meaning of 18 U.S.C. Section

1961(3), which defines "person" to include "any individual or entity capable of holding a

legal or beneficial interest in property."

55

**The RICO Enterprise**
**18 U.S.C., Section 1961(4)**

284.     Under Section 1961(4), the term "enterprise" includes "any individual,

partnership, corporation, association, or other legal entity, and any union or group of

individuals associated in fact, although not a legal entity."

285.     Together as a whole or in various sub-groups of individuals and legal entities, the

Defendants and non-parties constitute one or more RICO enterprises, within the meaning

of 18 U.S.C Section 1961(4), consisting of an association-in-fact for the purpose of

devising, instituting, and maliciously prosecuting fraudulent claims and lawsuits (the

"Enterprise").

286.     The Enterprise constitutes a distinct unit, separate and apart from the

organizational structures and business operations of its associated groups of individuals

and legal entities.

287.     Each Defendant shares a common purpose with the other associates of the

Enterprise: To use legal process and court procedures to achieve a fraudulent and

improper purpose, that is, to harass and extort money from their victims (the "Scheme").

288.     The Enterprise is the instrument of the Defendant's racketeering activities. Each

Defendant is connected to the Enterprise by their conduct and participation in its affairs,

including: (a) devising fraudulent legal claims; (b) instituting and prosecuting the

fraudulent claims in court; (c) perverting legal process and court rules and procedures to

conduct the affairs of the Enterprise; (d) employing improper litigation tactics to conceal

evidence and obstruct their victims' discovery; (e) engaging in excessive motion practice

to increase their victim's costs to defend the fraudulent claims; and, (f) asserting

fraudulent damage claims to force their victims to "settle" the litigation.

289.　　Each Defendant associates with the Enterprise and engages in its racketeering

affairs to derive financial gain. Each Defendant has a financial interest in the Enterprise.

290.　　Each Defendant is functionally and systemically linked to the Enterprise through

the deliberate coordination of their actions, including:

A. Zayotti was referred to Smith by Attorney Beauregard. During *Foscaldo*, there were contacts between them.

B. Smith and AM-PM retained Zayotti to render legal services and investigate defenses and counterclaims relating to the Foscaldo litigation.

C. During *Foscaldo*, Zayotti communicated frequently with Beauregard in her capacity as an employee of AM-PM.

D. Beauregard loaned Smith $112,500.00, the amount of the first payment due on his Note.

E. Zayotti prepared the defense and counterclaims in *Foscaldo*.

F. Zayotti prepared and filed the Complaint in *Smith*.

G. Zayotti, Smith and Beauregard attempted to entrap and coerce Paster into making statements against his interests.

H. Zayotti assisted Smith with retaining Arrowood to assume the *Smith* litigation. Zayotti conferred with Arrowood, Smith and Beauregard on several occasions before Arrowood was retained.

I. Kayatta attempted to file the Amended Complaint in *Smith*.

J. After Zayotti "ceased representing" Smith and AM-PM, he represented Beauregard.

K. During the *Smith* litigation, Zayotti provided Beauregard with legal advice and had email and verbal contact with her. During *Smith*, she asked Zayotti for at least one document relating to the *Foscaldo* litigation, which he located and provided to her.

L. Kayatta advised and communicated with Smith, AM-PM and Beauregard with respect to their fraudulent claims against Plaintiff.

M.  Beauregard learned from Zayotti that AM-PM retained Plaintiff to prepare the Addendum.

N.  In September 2013, Beauregard "exchanged emails" or had a "follow up conversation" with Shay about the "clear intention" of the Addendum.

O.  In October 2013, Arrowood and Kayatta appeared in *Fosclado*. They represented Smith and AM-PM in that case until January 30, 2014, when the parties executed a "settlement" agreement.

P.  During the *Smith* litigation, while he was representing Beauregard, Zayotti continued to have contact with AP attorneys.

Q.  During the *Smith* litigation, while he was representing Beauregard, the *Smith* plaintiffs and their AP attorneys continued to rely on Zayotti and sought his advice and counsel because of his long historic participation in the case.

R.  In October 2013, Zayotti transferred his *Foscaldo* case files to AP. The transfer of the *Foscaldo* litigation from KW to AP involved a good deal of transition work. There were many conversations between Zayotti and AP attorneys relating to the transition and requests for information from him.

S.  On October 17, 2013, Kayatta filed a Motion to Amend the Complaint in *Smith*.

T.  On November 18, 2013, Kayatta filed the Amended Complaint, adding Beauregard and Plaintiff as parties in *Smith*.

U.  On December 3, 2013, Kayatta caused Plaintiff to be served with the Amended Complaint.

V.  In March 2015, Zayotti, Arrowood and Kayatta participated in *exparte*, undisclosed phone conversations in which they discussed his testimony prior to his deposition in *Smith*.

W.  On March 6, 2015, at his deposition, Zayotti obstructed the *Smith* defendants' discovery by refusing to give direct answers to even the most basic questions. During a break in his deposition, Arrowood and Kayatta met privately with Zayotti to give him the "coming attractions" of the topics Arrowood would ask him about.

X.  Immediately after Zayotti's deposition, Arrowood proposed that the parties engage a mediator.

Y.  On March 17, 2015, Arrowood was served with Plaintiff's motion for summary judgment.

Z.  On March 17, 2015, Kayatta, who signed the Amended Complaint, adding Beauregard's personal claim for loss of consortium, appeared in *Smith* as "Private Counsel for Beauregard."

AA.      On March 24, 2015, the *Smith* parties (other than Plaintiff) and/or their attorneys participated in a mediation session with an attorney selected by Arrowood.

BB.      On March 25, 2015, by phone and email, Arrowood attempted to extort money from Plaintiff.

CC.      On April 15, 2015, the Superior Court granted Plaintiff's motion for summary judgment, without opposition. On September 15, 2015, the Court dismissed all counts against him.

291.      Each Defendant conducts the activities of the Enterprise in secrecy because it is in their common interest not to speak of or acknowledge the existence of the Enterprise.

292.      Each Defendant, as an associate of the Enterprise, cloaks its affairs in secrecy by: (a) conducting *exparte*, undisclosed meetings where important discussions take place; (b) concealing documents; (c) redacting billing records; (d) obstructing testimony; (e) abusing attorney-client privilege; (f) perverting court rules, and other means.

293.      Each Defendant conducts and participates in the affairs of the Enterprise by communicating and sharing information with the other associates on a continuing basis by means of the U.S. mail and telephone wires.

294.      The Enterprise is engaged in and affects interstate commerce by conducting a substantial part of its affairs through the transmission of information within and across state boarders through the U.S. mail and interstate wires.

**Each Defendant Conducts or Participates
In the Affairs of the Enterprise
18 U.S.C., Section 1962(c)**

295.     In their associations, each of the Defendants has conducted and participated,

directly or indirectly, in the affairs of the Enterprise, in the following ways:

A.  Smith, Beauregard and AM-PM: by devising and funding fraudulent claims and lawsuits
to harass, defraud and extort money from their victims, including Foscaldo, Paster, PRC,
Plaintiff and others;

B.  Zayotti: by devising and/or prosecuting fraudulent claims, including the defense and
counterclaims in *Foscaldo* and the Complaint in *Smith*;

C.  Zayotti: by failing to disclose his investigatory role in *Foscaldo* to Paster;

D.  Zayotti, Smith and Beauregard: by attempting to coerce and entrap Paster into making
statements against his interests;

E.  Zayotti: by providing advice and counsel to the other Defendants during the prosecution
of the fraudulent claims asserted in the Complaint and Amended Complaint in *Smith*;

F.  Zayotti: by obstructing discovery in *Smith* to conceal evidence from the defendants and to
conceal his role in the Enterprise;

G.  Kayatta: by devising and prosecuting the fraudulent claims asserted in the Amended
Complaint;

H.  Kayatta: by failing to conduct pre-filing due diligence in *Smith*, and/or by deliberately
ignoring the facts and law which would have been known to her had she not consciously
disregarded them;

I.  Kayatta: by knowingly preparing or serving false Answers to interrogatories, concealing
documents and otherwise obstructing the defendants' discovery in *Smith;*

J.  Kayatta: by failing to disclose her clients' false Answers and testimony in *Smith;*

K.  Kayatta: by providing advice and counsel to Smith and AM-PM in connection with
"settling" the *Foscaldo* litigation;

L.  Arrowood: by providing advice and counsel to Smith and AM-PM in connection with
"settling" the *Foscaldo* litigation;

M.  Arrowood: by maliciously prosecuting the fraudulent claims in *Smith*;

N.  Arrowood: by obstructing discovery in *Smith,* including tainting Zayotti's testimony, failing to disclose binding adverse authority, and abusing attorney-client privilege; and,

O.  Arrowood: by perverting the Superior Court rules in an attempt to extort money from Plaintiff.

296.     The Defendants' activities, as set forth above, are in violation of 18 U.S.C.

Section 1962(c), with each of the Defendants acting in one or more capacities as primary

actors or agents and representatives of one another or aiders or abettors of one another.

## Defendants' Racketeering Activities
## 18 U.S.C., Section 1961(1)(B)
## Use of U.S. Mails and Interstate Wire Facilities
## 18 U.S.C., Sections 1341, 1343

297.     18 U.S.C. Section 1961(1) (B) defines the term "racketeering activity" to include

any act which is indictable under 18 U.S.C. Section 1341 (relating to mail fraud) and 18

U.S.C. Section 1343 (relating to wire fraud).

298.     Section 1341 prohibits any person from knowingly using the U.S. mail system for

the purpose of executing any scheme to defraud or to obtain money or property by means

of false or fraudulent pretenses.

299.     Section 1343 prohibits any person from knowingly using the interstate wire

facilities for the purpose of executing a scheme to defraud.

300.     Each separate use of the U.S. mail or interstate wire facilities in furtherance of a

scheme to defraud constitutes a separate offense.

301.     In furtherance of the Scheme, the Defendants rely upon the frequent transfer of

funds, documents and information through the U.S. mail and interstate wire facilities.

302.     Defendant AM-PM does business throughout New England and maintains offices

in Waltham, Massachusetts and Manchester, New Hampshire.

303.     Defendants Smith and Beauregard reside in New Hampshire and conduct business

directly and through AM-PM and other entities in Massachusetts, New Hampshire and

other states.

304.     Given their substantial physical presence in New Hampshire, Plaintiff is informed

and believes that Defendants Smith and Beauregard communicate frequently about the

affairs of the Enterprise through the U.S. mail and interstate wire facilities with other

Defendants, financial institutions and other persons in New Hampshire, Massachusetts

and other states.

305.     Defendants Zayotti, Arrowood and Kayatta reside in Massachusetts and conduct

business from their offices in Boston.

306.     Given their substantial physical presence in Massachusetts, Plaintiff is informed

and believes that Defendants Zayotti, Arrowood and Kayatta's communicate frequently

about the affairs of the Enterprise through the U.S. mail and interstate wire facilities with

Smith, Beauregard and others in Massachusetts, New Hampshire and other states.

307.     In furtherance of the Scheme, Plaintiff is informed and believes that the

Defendants frequently rely on the U.S. mail and interstate wire facilities to transfer funds,

documents and information within and across state lines. The success of the Scheme is

dependent upon the information, documents and funds that passed through the U.S. mail

and interstate wire facilities.

308.     In furtherance of the Scheme, Plaintiff is informed and believes that the

Defendants transmit through the U.S. mail and interstate wire facilities within and across

state lines documents containing omissions or misrepresentations reasonably calculated to deceive persons of ordinary prudence and comprehension.

309.      The Defendants' use of the U.S. mail and interstate wire facilities in furtherance of the Scheme occurs frequently and involves numerous communications, including:

A. Communications between and among the Defendants, including Smith's, AM-PM's and Beauregard's phone calls with, and emails to/from, AM-PM, Zayotti, Arrowood and Kayatta regarding the *Foscaldo* litigation; the *Smith* Complaint, the Amended Compliant and related pleadings; and, the "settlements" with Foscaldo, Paster and PRC.

B. Communications between and among Zayotti, Arrowood, Kayatta, other KW and AP attorneys, and their respective offices through the U.S. mail and interstate wire facilities.

C. Communications between the Defendants and their victims, including Smith's, AM-PM's and Beauregard's phone calls, faxes and emails to/from, Foscaldo, Paster, and Plaintiff; Zayotti's phone calls, faxes and emails to/from Paster, Plaintiff and counsel to Foscaldo and Paster, respectively; Arrowood's phone calls, faxes and emails to/from counsel to Foscaldo, Paster, and Plaintiff, respectively; and, Kayatta's phone calls, faxes and emails to/from counsel to Foscaldo, Paster, and Plaintiff, respectively.

D. Communications between the Defendants and others, including Smith and Beauregard's phone calls, faxes and emails to/from Shay, and others; Zayotti's phone calls, faxes, emails and letters to/from the District Attorney, Attorney Beauregard, Shay, process servers, stenographers, and others; Arrowood's phone calls, faxes, emails and letters to/from Shay, process servers, stenographers, and others; Kayatta's phone calls, faxes, emails and letters to/from Shay, process servers, stenographers and others.

E. Communications, including letters and emails, filed by Zayotti, Kayatta and Arrowood through the U.S. mail and interstate wire facilities with the Superior Court containing false statements with respect to the fraudulent claims asserted in the *Foscaldo* and *Smith* lawsuits.

F. Transmission of funds by the Defendants through the U.S. mail and interstate wire facilities, including payments and deposits to the court, attorneys, process servers, investigators, stenographers, and mediators.

G. The receipt of funds by the Defendants through the U.S. mail and interstate wire facilities, including funds received by KW and AP; and funds received, if any, from Foscaldo, Paster, PRC and others by one or more of the Defendants.

310.     The Defendants' acts of mail and wire fraud constitute predicate acts of

racketeering under 18 U.S.C., Section 1961(1) (B). Such predicate acts caused economic

harm to Plaintiff, which affords him standing under 18 U.S.C. Section 1964(C).

311.     In addition to the above racketeering acts, it was foreseeable to each Defendant,

that Zayotti, Arrowood and Kayatta would distribute pleadings and other court

documents containing omissions or misrepresentations through the U.S. mail and

interstate wire facilities.

312.     The successful operation of the Scheme depended upon secrecy. As such, many

dates on which the Defendants used the U.S. mail and interstate wire facilities in

furtherance of the Scheme have not yet been disclosed and cannot be alleged without

access to the Defendants' emails, phone and billing records.

**Defendants' Racketeering Activities**
**Extortionate Acts**
**18 U.S.C., Section 1961(1)(A) and (B)**
**18 U.S.C., Section 1951**

313.     In addition to mail and wire fraud, the Defendants' racketeering activities include

extortionate acts, as defined in 18 U.S.C. Sections 1951 and 1961(1) (A) and (B).

314.     18 U.S.C Section 1951 prohibits actual or attempted extortion affecting interstate

commerce in any way or degree. The crime of extortion includes obtaining property by a

person with the victim's consent, which is induced by the wrongful use of threatened

force, violence or fear, including fear of economic harm.

315.     M.G.L. c, 265, section 25 provides that whoever maliciously threatens an injury

to the person or property of another with intent thereby to extort money shall be punished

by imprisonment or by a fine or both.

316.    The Defendants, under the pretext of legal process prepared and filed by their attorneys, made extortionate threats with the intent that their victims rely on said legal process and respond in court. It is foreseeable to the Defendants that their victims will suffer additional economic harm, including legal fees, as the direct and proximate cause of their Scheme.

317.    The Defendants employ the threat of fraudulent damage claims and ongoing, financially burdensome litigation to extort "settlement" payments from their victims, thereby causing them to foreseeably part with property.

318.    As a result of the Defendants' extortionate threats, Plaintiff and other victims of the Scheme incur legal fees, make "settlement" payments and/or suffer other foreseeable economic harm.

319.    In furtherance of the Scheme, by phone and email, the Defendants, under the pretext of the court's procedural rules, demanded money from Plaintiff and other victims of the Scheme. The Defendants' money demands range from $50,000 to over $624,000, i.e., the "full amount my clients [the *Smith* Plaintiffs] are going to demand."

320.    At the time the *Foscaldo* defense and counterclaims were filed, the Defendants' knew that the Note set forth the parties' entire agreement and that Smith's obligations thereunder were absolute and unconditional.

321.    When the *Smith* Complaint and Amended Complaint were filed, the Defendants were aware of the Superior Court decision and Order in *Foscaldo*.

322.    In furtherance of their extortionate Scheme, knowing that there was no factual or legal basis for the defense and claims asserted in *Foscaldo*, or the claims asserted in *Smith*, each of the Defendants associated with the Enterprise and participated in the

conduct of its affairs, through a pattern of racketeering activity, including the following threats of economic harm made under the pretext of legal process and court rules:

(a) Smith and AM-PM brought and funded the fraudulent defense for non-payment of the Note and the fraudulent counterclaims in *Foscaldo;*

(b) Zayotti devised and maliciously prosecuted the fraudulent defense and counterclaims in *Foscaldo*;

(c) Beauregard loaned Smith $112,500.00 and deposited it with Paster or to his escrow account;

(d) Arrowood and Kayatta "settled" the fraudulent defense and counterclaims in *Foscaldo*, with Smith and AM-PM essentially agreeing to re-instate annual installment payments for the amount due under the Note.

(e) Zayotti, Smith and Beauregard sought to entrap and coerce Paster into making statements against his interests.

(f) Zayotti provided advice and counsel to the other Defendants in connection with the "settlement" of the fraudulent defense and counterclaims in *Foscaldo*;

(g) Smith and AM-PM brought and funded the fraudulent claims against Paster and PRC asserted in the *Smith* Complaint;

(h) Zayotti devised the fraudulent claims asserted against Paster and PRC and signed and filed the *Smith* Complaint;

(i) Smith, AM-PM and Beauregard brought and funded the additional fraudulent claims against Paster, PRC and Plaintiff asserted in the *Smith* Amended Complaint;

(j) Kayatta devised and filed the additional fraudulent claims against Paster, PRC and Plaintiff in the *Smith* Amended Complaint;

(k) Zayotti provided advice and counsel to the other Defendants in connection with the preparation of the additional fraudulent claims in the *Smith* Amended Complaint;

(l) Arrowood devised and/or ratified the fraudulent claims asserted against Paster, PRC and Plaintiff in the *Smith* Amended Complaint;

(m)Kayatta maliciously prosecuted the fraudulent claims asserted against Paster, PRC and Plaintiff in the *Smith* Amended Complaint;

(n) Kayatta obstructed discovery in *Smith* by deliberately ignoring the *Foscaldo* decision and Order; concealing responsive documents in discovery; knowingly serving false Answers to interrogatories; and, failing to disclose the *Smith* plaintiffs' fraud on the Superior Court and Plaintiff;

(o) Arrowood maliciously prosecuted the fraudulent claims asserted against Paster, PRC and Plaintiff in the *Smith* Amended Complaint;

(p) Arrowood obstructed discovery in *Smith* by deliberately ignoring the *Foscaldo* decision and Order; concealing responsive documents in discovery; tainting witness testimony; abusing attorney-client privilege; and, failing to disclose the *Smith* plaintiffs' fraud on the Superior Court and Plaintiff;

(q) Arrowood made extortionate threats and demands for money on Paster and PRC;

(r) Arrowood attempted to extort $50,000 from Plaintiff; and,

(s) Arrowood "settled" the fraudulent claims asserted against Paster and PRC in the *Smith* Amended Complaint;

323.    The Defendants' extortionate acts, as set forth above, constitute predicate acts of racketeering under Section 18 U.S.C 1961(1) (A) and (B).

324.    The Defendants' activities, as set forth above, are in violation of 18 U.S.C. Section 1962(c), with each of the Defendants acting in one or more capacities as primary actors or agents and representatives of one another or aiders or abettors of one another.

### Defendants' Pattern of Racketeering Activity
### 18 U.S. C., Section 1961(5)

325.    A "pattern" of racketeering activity is defined by 18 U.S.C., Section 1961(5) to mean two or more related predicate acts that pose a threat of continued criminal activity.

326.    In furtherance of the Scheme, each of the Defendants has conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including multiple acts of mail fraud, wire fraud and extortion.

327.     Each such act is a "racketeering activity" under 18 U.S.C. Section 1961.
Together, the predicate acts constitute a "pattern" of racketeering activity under 18
U.S.C. Section 1961(5).

328.     The factors of continuity and relationship combine to produce a "pattern" of
racketeering activity. By requiring that the racketeering acts be related, Congress
intended that the predicate acts have the same or similar purposes, results, participants,
victims, or methods of commission, or are otherwise interrelated and not isolated events.

329.     The Defendants' racketeering activities are related because they amount to a
common course of conduct involving the same participants (the Defendants), using the
same methods (abuse of legal process and malicious prosecution), with the same intended
purpose (harass and extort money) from similarly situated victims.

330.     By requiring that the racketeering activities amount to continued criminal activity,
Congress intended that they extend over a substantial period of time. In determining
whether the continuity test is met, the courts consider the duration and frequency of the
racketeering activities.

331.     With respect to duration, most courts require that the predicate acts extend over a
period of at least one year. In one case, the First Circuit determined that ninety-five
fraudulent mailings over four and one-half years is the type of long-term criminal
conduct that constitutes continued criminal activity.

332.     The Defendants' racketeering activities form a pattern of criminal conduct
involving the improper use of legal process to maliciously prosecute fraudulent lawsuits,
with the intent to harass and extort money from their victims. The Defendants'
extortionate Scheme involved 140 or more related predicate acts which continued for

68

more than three and one-half years. During that period each Defendant committed multiple racketeering acts while conducting and participating in the ongoing affairs of the Enterprise. The 140 or more related predicate acts were identified without access to or examination of KW's phone, email and billing records in the Beauregard engagement and AP's phone, email and billing records in the *Foscaldo* and *Smith* engagements.

333.     In furtherance of the Scheme, through related, frequent and continuous acts of mail fraud, wire fraud and extortion, the Defendants engaged in a pattern of racketeering activity, posing the threat of continued criminal activity.

334.     The Defendants sought to force their victims to "settle" the fraudulent suits, knowing that Smith, AM-PM and Beauregard suffered no recoverable damages.

335.     By knowingly filing fraudulent claims in the Superior Court and maliciously prosecuting those claims against their victims, the Defendants engaged in a fraudulent course of conduct constituting a pattern of racketeering activity.

### Damages Caused By the Defendants' RICO Activity
### 18 U.S.C., Section 1964(c)

336.     As a direct and proximate cause of the Defendants' participation in, and conduct of, the affairs of the Enterprise, through a pattern of racketeering activity, Plaintiff has been injured in his business and/or property, and, pursuant to the civil remedy provisions of 18 U.S.C. Section 1964(c), is entitled to recover threefold the damages suffered, together with costs of suit and reasonable attorneys' fees thereon.

337.     The Plaintiff's injuries were the direct and proximate cause of the Defendants' racketeering activities because an intended consequence of the Defendants' Scheme was that Plaintiff would be forced to respond in court.

338.    The Defendants' racketeering acts caused Plaintiff to incur legal expenses to defend himself and litigate the false and malicious claims asserted in the Amended Complaint and to investigate the Defendants' activities.

339.    Pursuant to 18 U.S.C., Section 1964(c), the Defendants are jointly and severally liable to the Plaintiff for three times the damages he has sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

Third Count For Relief
**Prohibited RICO Activity**
**Conspiracy to Violate RICO, 18 U.S.C., Section 1962(d)**

340.    Plaintiff incorporates in this count by reference all allegations contained in this Complaint.

341.    At all relevant times, the Enterprise existed and affected interstate commerce;

342.    Each Defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the Enterprise;

343.    Each Defendant participated in the conduct of the affairs of the Enterprise; and,

344.    Each Defendant participated in the Enterprise through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate acts prohibited by Section 1962(c).

345.    The Defendants' agreement to engage in activity prohibited by Section 1962(c) violated Section 1962(d).

346.    The Defendants conspired to and agreed personally and/or through the conduct of their agents, employees and/or others acting at their direction and on their behalf, to engage in multiple acts of mail fraud, wire fraud and extortion over a substantial period of time.

347.     Each Defendant committed or caused to be committed a series of overt predicate

acts of racketeering activity, including, but not limited to, the acts described in this

Complaint.

348.     As the direct and proximate cause of said overt predicate acts of racketeering and

of the Defendants' violation of  Section 1962(d), the Plaintiff suffered injury to his

business or property within the meaning of 18 U.S.C. Section 1964(c).

349.     As a result of their conspiracy in violation of Section 1962(d), the Defendants are

liable to the Plaintiff for his losses, in amounts to be determined at trial.

350.     In addition, pursuant to Section 1964(c), the Plaintiff is entitled to recover treble

damages, plus costs and attorneys' fees from the Defendants.

### Fourth Count for Relief
### KW and AP Gross Negligence

351.     Plaintiff incorporates by reference in this count all allegations contained in this

Complaint.

352.     As partners, Zayotti and Arrowood's knowledge of their unlawful activities is

attributable to KW and AP, respectively.

353.     From December 2011 through January 2014, KW billed Smith/AM-PM

$463,053.00 to defend Smith on the Note and to develop counterclaims against Foscaldo

and others. Of the approximately 1,491 hours billed, all but about 16 hours were charged

by Zayotti.

Q - I take it that the work you did for Smith and AM-PM, you were paid for your
services, which were outlined in the billing statements?
A – Yes, my firm was paid.
Q - Were there any disputes regarding payment?
A – No.

71

354.    From October 2013 until March 17, 2015 or later, Zayotti represented

Beauregard. Presumably, Beauregard, AM-PM or Smith paid KW for those services.

355.    From November 2013 through March 2014, AP billed Smith $161,149.99 for

legal services "in reference to J. Kenneth Foscaldo." AP also performed services in

*Smith*, for which it was, presumably, paid by Smith, AM-PM and/or Beauregard.

356.    Both KW and AP had a duty to comply with peer-review procedures and practices

similar to those customarily adopted by Boston law firms.

357.    KW and AP failed to exercise the reasonable care required under such practices

and procedures with respect to the legal services Zayotti, Kayatta and Arrowood

performed for Smith, AM-PM and Beauregard.

358.    As a result of KW's and AP's failure to exercise such reasonable care, their

attorneys provided materially false and misleading information to Plaintiff, the Superior

Court and others, and they failed to disclose to Plaintiff and others pertinent and material

information, including the *Foscaldo* decision and Order. The failure to disclose such

material information is tantamount to providing false information.

359.    KW's and AP's attorneys made misrepresentations and failed to disclose material

information with the intent that Plaintiff and others would rely on the misrepresentations

and omissions and agree to settle.

360.    In deciding whether to settle or retain counsel and defend the fraudulent suit,

Plaintiff reasonably and justifiably relied on the misrepresentations of KW's and AP's

attorneys and did not know the pertinent and material information they failed to disclose

to him.

361.     Had he known the misrepresentations were untrue and been aware of the pertinent
and material information that KW's and AP's attorneys' failed to disclose, Plaintiff
would not have retained counsel or incurred significant expense investigating the
Defendants' Scheme.

362.     Had they properly reviewed their attorneys' services and work product, KW's and
AP's names and resources, including legal and administrative support, phone lines,
servers, computers, email, fax machines and bank accounts, would not have been
available to Zayotti, Arrowood, Kayatta and others, to maliciously prosecute the
*Foscaldo* and *Smith* cases, or to conduct the affairs of the Enterprise.

363.     As the direct and proximate result of KW's and AP's failure to properly review its
attorneys' services and work product, Plaintiff suffered damages in an amount to be
determined at trial.

## Fifth Count For Relief
## Violation of Massachusetts General Laws
## Chapter 93A, Sections 2 and 11

364.     Plaintiff incorporates by reference in this count all allegations contained in this
Complaint.

365.     Plaintiff is engaged in trade or commerce within Massachusetts as a sole
practitioner of law.

366.     Defendants AM-PM, KW and AP are engaged in trade or commerce within and
without Massachusetts.

367.     Defendants Smith, Beauregard, Zayotti, Arrowood and Kayatta, acting in one or
more capacities as officers, partners, employees, agents or representatives of AM-PM,
KW and/or AP, aided and/or abetted and/or conspired in the Scheme.

368.     The Defendants knowingly and willingly engaged in unfair or deceptive acts and practices within the meaning of Chapter 93A. The Defendants filed a defense and counterclaims in *Foscaldo* and claims in *Smith* in the Superior Court despite the knowledge that their defense and claims were fraudulent and that they did not intend to fully litigate said claims.

369.     The Defendants filed suit as part of their extortionate Scheme, with the ulterior motive of forcing "settlements" from their victims. The Defendants used their frivolous court filings, together with threats of fraudulent damage claims and protracted and financially burdensome litigation, as leverage against their victims, including Plaintiff.

370.     The Defendants' knowing or willful unfair deceptive acts and practices occurred in the course of the Defendants' extortionate Scheme and such practices directly caused actual damages and injury to Plaintiff and others. Plaintiff's injuries occurred in Massachusetts, as did the injuries of other similarly situated victims.

371.     The Defendants' misrepresentations and deceptive acts had a tendency to or were capable of deceiving the Plaintiff and others, which, in fact, they did. Plaintiff and others relied on the Defendants' misrepresentations and deceptive acts, which acts remain uncured.

372.     The Defendants' knowing or willful unfair and/or deceptive acts and practices caused Plaintiff and others to suffer an ascertainable loss of money. Such loss arose from the Defendants' concealment of, and failure to disclose, the true facts regarding their fraudulent claims and their lack of intent to fully litigate such claims. The Defendants' knowing or willful unfair and/or deceptive acts and practices included the filing of a

fraudulent defense and claims with the intent to force "settlements" from the Plaintiff and others.

373.       By reason of the foregoing, Plaintiff is entitled to treble damages, punitive damages, injunctive relief, attorney fees and costs as provided by Chapter 93A.

374.       Plaintiff also seeks permanent injunctive relief as a result of the Defendants' ongoing violations of Chapter 93A, including an order directing the Defendants to disclose to Plaintiff all material facts relating to Defendants' Scheme, including any "settlements" received, waiver of any and all non-disclosure terms in the "settlement" agreements, copies of all "settlement" agreements and/or mediation reports and the identities of all actual or intended victims of the Scheme.

375.       Receipt of such information will afford Plaintiff with the opportunity to make informed decisions regarding his rights and prevent the Defendants from further perpetrating the Scheme.

376.       A monetary award alone will fail to provide full relief to Plaintiff. Money damages will not compensate Plaintiff for his current lack of information, which is in the exclusive control of the Defendants. Absent a court order, Plaintiff will be unable to obtain the information necessary to make informed decisions regarding his rights.

Fifth Count for Relief
**Civil Conspiracy**

377.       Plaintiff incorporates by reference in this count all allegations contained in this Complaint.

378.       Each Defendant acted in concert and participated in a common plan to achieve the unlawful acts described above.

379.    Each Defendant has collaborated in false representations designed to cloak the claims against Plaintiff in color of right. They thereby acted in unison to exercise powers over Plaintiff that they would not have had if acting independently.

380.    The Defendants' concerted actions constitute a civil conspiracy, which employed unlawful conduct to cause damage to Plaintiff and others.

381.    The Defendants' concerted actions caused harm to Plaintiff and to others that could not have been caused by any Defendant acting alone.

382.    The Defendants' concerted actions have at all times relevant to this action been willful and/or knowing.

383.    As a direct and proximate result of the Defendants' concerted actions and civil conspiracy, Plaintiff and others have suffered damages.

## RELIEF REQUSTED

WHEREFORE, the Plaintiff prays for judgment and seeks the following remedies:

1.  Damages in an amount to be proven at trial, including but not limited to compensatory and consequential damages;

2.  Treble damages under RICO, 18 U.S.C Section 1961 *et seq*.; and Massachusetts General Laws ch. 93A;

3.  Punitive damages on any and all causes of action permitting such damages;

4.  Reimbursement of all money that Plaintiff spent on legal representation, court costs and other expenses that would have been avoided but for the Defendants' false, fraudulent, deceptive, misleading, and/or negligent statements, representations, and/or omissions;

5.  An attachment against the Defendants' property, attorney fees, and costs as provided by M.G.L., ch. 223, section 42;

6. That the Court adjudicate and enter an injunction restraining the Defendants, and those acting in concert with any of them, from selling or disposing of the assets they acquired through the Scheme; from threats of instituting or institution of any litigation against Plaintiff; and, to stop the Scheme;

7. A finding that the Enterprise is an alter ego for others, including, but not limited to, Smith, Beauregard, AM-PM, Zayotti, Arrowood, and Kayatta; and the imposition of joint and several liability for the damages caused by their actions;

8. Attorney fees and costs incurred by Plaintiff in prosecuting this action;

9. Pre-judgment and post-judgment interest as provided pursuant to 28 U.S.C., Section 1961; M.G.L. c. 231, Section 6F; M.G.L. c. 235, Section 8; and,

10. That the Court adjudicate and award such additional or other relief as it deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury in this case.

Dated: November 21, 2017

Respectfully Submitted,

Richard Langan, Pro Se
325 Boston Post Road
Suite 2
Sudbury, Middlesex County
Massachusetts  01776
(978) 443-4000
RLangan@richardlanganesq.com

77

## CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

November 21, 2017

Richard Langan, Pro Se