```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

_____
                                   )
RICHARD LANGAN,                    )
                                   )
                  Plaintiff,       )     Civil Action
                                   )     No. 17-12095-PBS
       v.                          )
                                   )
JOHN H. SMITH, AMPM FACILITY       )
SERVICES CORP., MARY JANE          )
BEAUREGARD, MATTHEW P. ZAYOTTI,    )
LISA G. ARROWOOD, ELIZABETH A.     )
KAYATTA, KEEGAN WERLIN LLP, and    )
ARROWOOD LLP,                      )
                                   )
                  Defendants.      )
_____)

**MEMORANDUM AND ORDER**

May 31, 2018

Saris, C.J.

**INTRODUCTION**

This case stems from a 2013 legal malpractice suit against Plaintiff Richard Langan, a solo practitioner of law. Having prevailed in that suit, Langan now brings this action under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), and state law. Because the complaint fails to allege a plausible RICO claim, Defendants' motions to dismiss (Dkt. Nos. 30, 35, and 42) are **ALLOWED** with respect to the RICO counts. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

1

Accordingly, the case is **DISMISSED** without prejudice to filing the state-law claims in state court.

## FACTUAL BACKGROUND

The following facts are drawn from the complaint.

### I. The Defendants

The Defendants fall into three groups: the Smith Defendants, the Arrowood Defendants, and the Keegan Defendants.

The Smith Defendants include the entity at the center of this case: AMPM Facility Services Corporation ("AMPM"), a janitorial services company. Defendant John Smith owns and operates AMPM, and is its president, treasurer, secretary, director, registered agent, and sole shareholder. Defendant Mary Beauregard is Smith's wife and an AMPM employee.

The Arrowood Defendants include the Massachusetts law firm Arrowood LLP, as well as two of its attorneys: Lisa Arrowood, a partner, and Elizabeth Kayatta, an associate.

The Keegan Defendants include another Massachusetts law firm, Keegan Werlin LLP, and one of its former partners, Matthew Zayotti.

### II. Cleaning Up an Employment Contract

In the fall of 2010, Smith began to negotiate new terms of employment with J. Kenneth Foscaldo, who had served as AMPM's general manager since 1990. In September 2010, Smith and AMPM retained attorney Richard Paster to represent them in these

negotiations. Over the course of several months, the negotiations produced three interrelated documents, all drafted by Paster: a stock-purchase agreement, a five-year promissory note, and an employment agreement.

Via the stock-purchase agreement, Foscaldo sold his shares of AMPM stock to Smith; in exchange, Smith signed the note, which bound him to pay Foscaldo in annual installments of $112,500. At the same time, Foscaldo signed the employment agreement, which provided that AMPM could only terminate Foscaldo "for cause." The promissory note and the employment agreement were connected by way of an acceleration clause that permitted Foscaldo to demand immediate payment on the full amount of the note if AMPM terminated his employment without cause or if Smith missed a payment.

In July 2011, Foscaldo and AMPM agreed to modify the employment agreement. George Shay, then the president of AMPM, retained Langan to memorialize these changes via an addendum to the employment agreement, which provided that either AMPM or Foscaldo could terminate it without cause upon 30 days' written notice. However, Langan did not alter the note's acceleration clause, which continued to require full payment if Foscaldo were terminated without cause. Langan billed one hour of time to prepare the addendum.

### III. <u>Things Get Messy</u>

In November 2011, AMPM fired Foscaldo without cause, and Foscaldo sued to enforce the note's acceleration clause. In November 2012, a Massachusetts Superior Court judge awarded summary judgment in Foscaldo's favor, determining that the addendum, as drafted by Langan, could not be read to alter the note's acceleration clause, and thus the entire note was due.

Faced with this adverse ruling, Smith and AMPM, in May 2013, sued Paster for malpractice over his drafting of the documents. This malpractice complaint was drafted and filed by Zayotti, one of the Keegan Defendants. Over the next several months, AMPM, Smith, and Beauregard retained Arrowood and her firm to represent them in the malpractice suit. In November 2013, Kayatta filed an amended complaint adding Beauregard as a plaintiff. It also added Langan as a defendant.

The amended complaint asserted three claims against Langan: legal malpractice, negligent infliction of emotional distress, and loss of consortium. In essence, it alleged that Langan's role in drafting the addendum to the employment agreement was to "ensure Foscaldo's smooth termination," but that Langan failed to consult the note or stock-purchase agreement, and failed to advise AMPM that a termination without cause could still trigger the note's acceleration clause.

4

Ultimately, the malpractice claims against Langan foundered, and, in April 2015, the Superior Court granted Langan's unopposed motion for summary judgment. The case against Paster settled shortly thereafter.

IV. **Procedural History**

In November 2017, Langan, acting on his own behalf, commenced this suit. His complaint contains six counts: Count I, malicious prosecution (against AMPM, Smith, Beauregard, Kayatta, and Arrowood); Count II, civil RICO, 18 U.S.C. § 1961, et seq. (against all Defendants); Count III, conspiracy to violate RICO, 18 U.S.C. § 1962(d) (against all Defendants); Count IV, gross negligence (against Arrowood LLP and Keegan Werlin LLP); Count V, violation of Mass. Gen. Laws ch. 93A, § 11 (against all Defendants); and Count VI, civil conspiracy (against all Defendants).

Each set of Defendants has moved to dismiss. Langan, now represented by counsel, has opposed each motion.

**LEGAL STANDARDS**

I. **Motion to Dismiss**

In analyzing whether a complaint has stated a claim sufficient to satisfy Federal Rule of Civil Procedure 12(b)(6), the Court must set aside any statements that are merely conclusory and examine the factual allegations to determine if there exists a plausible claim upon which relief may be granted.

Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 75 (1st Cir. 2014). The Court must draw reasonable inferences in the pleader's favor. Id.

## II. Civil RICO

"A successful civil RICO action requires proof of four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 163 (D. Mass. 2003) (citations and quotation marks omitted). As pertinent here, "the 'pattern' element requires a plaintiff to show at least two predicate acts of 'racketeering activity,' which is defined to include violations of specified federal laws, such as the mail and wire fraud statutes." Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 15 (1st Cir. 2000) (citing 18 U.S.C. § 1961(1)(B), (5)). Generally, a RICO conspiracy claim under 18 U.S.C. § 1962(d) can only survive when rooted in a viable substantive RICO claim. See id. at 21; Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).

## DISCUSSION

## I. RICO Counts

Plaintiff bases his RICO claims on two underlying predicates: extortion, 18 U.S.C. § 1951; and mail and wire fraud, 18 U.S.C. §§ 1341, 1343. Defendants argue that Plaintiff fails to adequately allege these RICO predicates for at least

6

two reasons. First, they contend that litigation activities -- even if undertaken in bad faith -- cannot, as a matter of law, constitute RICO predicates. Second, they argue that the specific conduct alleged in the complaint does not rise to the level of extortion or fraud. Alternatively, Defendants argue that the RICO counts fail because the complaint does not adequately allege a "pattern" of activity that poses a serious threat of continuation. Plaintiff contends that his complaint details a sufficient pattern of racketeering activity beyond the scope of any litigation conduct, such that his RICO claims must survive a motion to dismiss.

### A. Extortion as a RICO Predicate

Plaintiff's 77-page complaint is wide-ranging, but the alleged RICO-extortion theory is relatively straightforward. At core, Plaintiff argues that Arrowood's March 2015 settlement demand of $50,000 in the malpractice suit constituted attempted extortion. He alleges that Kayatta assisted in this scheme by filing the initial lawsuit, and by serving Smith's and AMPM's answers to interrogatories despite knowing that they contained false statements. Plaintiff's briefs do not discuss any specific extortive conduct by the Smith Defendants or the Keegan Defendants.

Federal courts have overwhelmingly rejected attempts to base extortion claims on litigation conduct, even when that

7

conduct is abusive or undertaken in bad faith. See, e.g., Raney v. Allstate Ins. Co., 370 F.3d 1086, 1087-88 (11th Cir. 2004) (holding that "alleged conspiracy to extort money through the filing of malicious lawsuits" could not constitute RICO predicate); Deck v. Engineered Laminates, 349 F.3d 1253, 1258 (10th Cir. 2003) ("[W]e join a multitude of other courts in holding that meritless litigation is not extortion under § 1951."); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract . . . does not constitute extortion."); First Pac. Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (concluding that threat of shareholder derivative suit was "not an extortionate act"); I.S. Joseph Co. v. J. Lauritzen A/S, 751 F.2d 265, 267 (8th Cir. 1984) (holding that threat to sue, even if "groundless and made in bad faith," did not constitute RICO predicate of extortion).[1]

As a whole, these cases reject the argument that the threat of a lawsuit (or, similarly, a settlement demand) constitutes the "wrongful use of actual or threatened force, violence, or

---

[1] Although it appears the First Circuit has not addressed the question in a published opinion, it has taken a similar view in an unpublished case. See Gabovitch v. Shear, 70 F.3d 1252 (1st Cir. 1995) (unpublished per curiam) (joining "[n]umerous courts [that] have held that the filing of litigation -- no matter how lacking in merit -- does not constitute a predicate racketeering act of extortion").

8

fear" for purposes of the extortion statute, 18 U.S.C. § 1951. E.g., I.S. Joseph Co., 751 F.2d at 267. Primarily this is because "[e]xtortion is the antithesis of litigation as a means of resolving disputes. To promote social stability, we encourage resort to the courts rather than resort to force and violence." Deck, 349 F.3d at 1258.

The rationale for this position is sound. Freely "recognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim." Id. As a result, "citizens and foreigners alike might feel that their right of access to the courts of this country had been severely chilled." I.S. Joseph Co., 751 F.2d at 267. But "the fact remains that litigation is as American as apple pie. If a suit is groundless or filed in bad faith, the law of torts may provide a remedy. Resort to a federal criminal statute is unnecessary." Id. at 267–68; see also von Bulow by Auersperg v. von Bulow, 657 F. Supp. 1134, 1143 (S.D.N.Y. 1987) (embracing narrow interpretation of RICO predicates to avoid "the federalization of state common law").

Attempting to sweep aside this body of law, Plaintiff points to a handful of cases in which RICO claims have survived because litigation activities were part of a larger extortive scheme. See Lemelson v. Wang Labs., Inc., 874 F. Supp. 430, 434 (D. Mass. 1994) (denying motion to dismiss based on allegations

9

that patentee had "extorted millions of dollars in settlement monies through a pattern of litigation involving infringement claims based on fraudulently obtained patents"); Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick, 726 F. Supp. 1083, 1097 (E.D. Mich. 1989) (permitting RICO claim to go forward based on alleged "filing of lawsuits and notices of lis pendens as part of a scheme to extort the plaintiffs' Property," where scheme included several other components). These cases are distinguished here because Plaintiff has not alleged any non-litigation conduct that constitutes extortion. As a result, Plaintiff's RICO-extortion theory fails to plausibly state a claim for relief.

**B.    Wire or Mail Fraud as a RICO Predicate**

Plaintiff also seeks to base his RICO claim on the predicates of mail and wire fraud, identifying the following actions as the core of his theory: (1) phone calls between Arrowood, Zayotti, and Kayatta to discuss Zayotti's deposition date, affidavits, and the acceleration clause; (2) Kayatta's use of the U.S. mail to serve AMPM's response to Langan's document request, deliberately omitting Shay's affidavit, in which Shay acknowledged he was concerned that firing Foscaldo would lead to litigation against AMPM; (3) Kayatta filing a second appearance in the malpractice suit as private counsel for Beauregard, allegedly to distance Zayotti from the case and to conceal the

existence of the alleged scheme to defraud; and (4) a laundry list of phone calls and correspondence by Zayotti.

As with extortion, courts typically are skeptical of attempts to fashion fraud-based RICO claims out of litigation activities. See Kim v. Kimm, 884 F.3d 98, 104 (2d Cir. 2018) (concluding that "allegations of frivolous, fraudulent, or baseless litigation activities -- without more -- cannot constitute a RICO predicate act"); FindTheBest.com, Inc. v. Lumen View Tech. LLC, 20 F. Supp. 3d 451, 459 (S.D.N.Y. 2014) (rejecting RICO-fraud theory because plaintiff failed to plausibly allege reliance on supposed misrepresentations by defendants); Daddona v. Gaudio, 156 F. Supp. 2d 153, 162 (D. Conn. 2000) ("Attempts to characterize abuse of process or malicious prosecution claims as mail and wire fraud violations for RICO purposes have been scrutinized by the courts, and have been rejected where the only allegedly fraudulent conduct relates to the filing of documents in litigation."); Auburn Med. Ctr., Inc. v. Andrus, 9 F. Supp. 2d 1291, 1297-99 (M.D. Ala. 1998) (holding that "allegations of mail fraud [were], in fact, merely artfully pled claims of malicious prosecution," and that such claims could not serve as RICO predicates); von Bulow, 657 F. Supp. at 1145 (rejecting RICO claim where alleged underlying fraud was "nothing more than a series of acts that, taken together, state a claim for malicious prosecution"). These cases

teach that RICO claims typically do not survive when rooted solely in litigation-related mail or wire fraud predicates. See Kim, 884 F.3d at 104; Daddona, 156 F. Supp. 2d at 162. And even where non-litigation fraud is alleged, those allegations must meet the heightened pleading standard of Rule 9(b). See FindTheBest.com, 20 F. Supp. 3d at 456.

Here, Langan identifies only routine litigation activities as the basis for the alleged fraud: discussions among attorneys; service of documents; an attorney's notice of appearance; and an attorney's litigation-related communications. The Court discerns nothing particular in them that rises to the level of mail or wire fraud, as opposed to possibly malicious prosecution. Accordingly, Plaintiff's RICO theory based upon mail or wire fraud cannot survive the motions to dismiss.

### C. Pattern of Racketeering Activity

Even if Plaintiff successfully alleged RICO predicate acts, his RICO claims would sputter for an independent reason. As Plaintiff himself acknowledges, a RICO claimant must also demonstrate that the defendant's predicate acts "amount to," or "otherwise constitute a threat of, continuing racketeering activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989) (emphasis in original). Although this "continuity" concept has eluded precise definition, see Efron, 223 F.3d at 15 & n.3, it is difficult to see how Langan's theory of the case

passes muster even under a broad understanding of the "continuity" requirement.

A RICO plaintiff can show continuity in two ways. Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 528 (1st Cir. 2015). Under the "open-ended" approach, a plaintiff can show "past conduct that by its nature projects into the future with a threat of repetition." Id. (quoting H.J. Inc., 492 U.S. at 237, 241). Under the "closed" approach, a plaintiff must prove a "closed period of repeated conduct" that "amounted to . . . continued criminal activity." Id.

Plaintiff makes only a passing attempt to satisfy the test for "open-ended" continuity. He argues that because Defendants Zayotti, Arrowood, and Kayatta ignored their duties, as officers of the court, to disclose or stop the alleged extortive and fraudulent scheme, they pose a threat of repeating their conduct in the future. Without any further factual allegations to support it, this bare assertion is not sufficient to establish the sort of genuine threat of ongoing criminality that the "open-ended" test requires. See H.J. Inc., 492 U.S. at 242-43 (discussing examples of "open-ended" continuity).

Under a "closed" approach, Plaintiff argues that the Defendants' scheme involved six or more victims, encompassed a minimum of 140 related predicate acts, and spanned a period of at least three-and-one-half years. Plaintiff is correct that

courts (including this Court) have found the continuity requirement satisfied based on shorter periods of illicit conduct. E.g., Laker v. Freid, 854 F. Supp. 923, 930 (D. Mass. 1994) (37 months). But duration alone is not dispositive. The First Circuit has prescribed a "natural and commonsense approach" that looks to additional "indicia of continuity," such as: (1) whether the scheme affected many people, or only a closed group of targeted victims; (2) whether the defendants were involved in multiple schemes, as opposed to one scheme with a singular objective; and (3) whether the scheme had the potential to last indefinitely, instead of having a finite nature. Home Orthopedics Corp., 781 F.3d at 529 (citations and quotation marks omitted). The core inquiry is "whether the specific fact pattern of the case . . . suggests the 'kind of broad or ongoing criminal behavior at which the RICO statute was aimed.'" Id. (quoting Efron, 223 F.3d at 18).

These factors point decisively away from "closed" continuity in this case. Plaintiff does not identify any of the six purported victims of the alleged RICO scheme, and the Court is hard-pressed to imagine who they might be aside from Langan (and, perhaps, Paster, who is not a party to this litigation). Further, although Plaintiff posits "140 or more" predicate acts as part of the alleged scheme, the nucleus of his complaint is the allegedly extortive and fraudulent malpractice litigation.

Plaintiff painstakingly details individual acts undertaken in the course of that litigation. But he does not allege any scheme untethered from his drafting of the addendum and the ensuing imbroglio over Foscaldo's termination.

For this reason, the facts in this case stand in sharp contrast to a case like United States v. Eisen, 974 F.2d 246 (2d Cir. 1992). Plaintiff cites Eisen for the proposition that frivolous litigation as part of a broader scheme of illicit conduct may constitute a RICO predicate. But the scheme in Eisen was expansive in scope. There, the Second Circuit upheld mail fraud as a criminal RICO predicate where several law-firm defendants pursued a host of counterfeit personal injury claims. Id. at 253-54. Unlike the litigation against Langan, the misconduct in Eisen extended well beyond the bounds of a malicious prosecution claim. The defendants earned millions of dollars in contingency fees by bringing 18 fraudulent personal injury lawsuits, id. at 251, over a period of about nine years, id. at 267. In addition to mail fraud, the scheme involved witness bribery and perjury. Id. at 253-54.

The activities alleged in Langan's complaint pale in comparison to the scope of the Eisen fraud.[2] At bottom, Plaintiff

---

[2] Plaintiff's reliance on Hall American Center Associates Limited Partnership v. Dick, 726 F. Supp. 1083 (E.D. Mich. 1989), is unavailing for essentially the same reason.

15

has alleged that Defendants "sought to accomplish a specific, narrow mission" that "stemmed from a single, discernible event." Home Orthopedics Corp., 781 F.3d at 530. As a result, he has failed to plausibly allege continuity for purposes of stating a RICO claim.

### D. RICO Conspiracy

A RICO conspiracy claim under 18 U.S.C. § 1962(d) typically cannot survive without a viable substantive RICO claim. See Efron, 223 F.3d at 21; Lightning Lube, Inc., 4 F.3d at 1191. Plaintiff does not suggest otherwise. Accordingly, his RICO conspiracy claim fails.

## II. Jurisdiction

As Plaintiff's counsel acknowledged at the hearing, the RICO counts provided the sole basis for this Court's original jurisdiction. Thus, the remaining question is whether the Court will exercise supplemental jurisdiction over Plaintiff's state-law claims.

According to the supplemental jurisdiction statute, a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." Cannarozzi v. Fiumara, 371 F.3d 1, 7 (1st Cir. 2004) (quoting 28 U.S.C. § 1367(c)). "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of

trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). Here, because Plaintiff's sole federal claim will be dismissed at this early stage, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

## ORDER

Defendants' motions to dismiss (Dkt. Nos. 30, 35, and 42) are **ALLOWED** with respect to the RICO claims. The state-law claims are **DISMISSED** without prejudice.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge